OPINION
By the Court,
Agosti, J.:
This appeal is from a final judgment pursuant to a jury verdict and a subsequent order denying a new trial. The jury awarded respondent $1,470,000.00, substantially more than she requested, in a personal injury action arising out of an altercation on a Las Vegas freeway. The primary question presented on appeal is whether misconduct by the plaintiffs attorney so permeated the *814 proceedings that it improperly influenced the jury, thereby warranting a new trial under NRCP 59(a). We conclude that it did; therefore, we reverse the district court’s judgment and order and remand for a new trial on damages.

FACTS

In June 1992 respondent Sherry Flick was riding as a passenger in a vehicle driven by her sister, Julie Flick. As they proceeded southbound on Interstate 15 in Las Vegas, appellant Kenneth DeJesus tailgated the Flick vehicle, then moved into its lane and forced it off the roadway into a ravine in the freeway median. The off-road travel cracked the front axle of the Flick vehicle. DeJesus stopped, got out of his vehicle, pounded his fists on the windshield of the Flick vehicle and made threatening gestures. DeJesus was cited for misdemeanor assault, and later pleaded guilty to the offense.
Sherry Flick filed a personal injury action against DeJesus, claiming negligence.[1] DeJesus rejected an offer to settle for $100,000.00; however, he stipulated to liability, so the only issue for trial was Flick’s damages. Consequently, most trial testimony related to the nature and extent of Flick’s injuries.
Flick’s medical experts, Dr. Edward N. Fishman and Dr. John Sterling Ford, testified that Flick sustained permanent brain and nerve damage when, during the accident, her head struck the vehicle and she jammed her hands against the dashboard. The brain damage caused Flick to suffer from headaches, dizzy episodes, blackouts, memory loss and neck pain, while the nerve damage caused numbness and tingling in Flick’s hands, and curling of her outer fingers in a claw-like manner. Dr. Ford testified he was not able to locate the head injury precisely, but it appeared that the balance organ in the inner ear had been damaged. He also testified there was little hope that Flick’s dizziness and blackout spells would cease, as they had persisted for four years, and that Flick’s carpal tunnel syndrome was not likely to improve, as it was getting worse. Flick’s sister, Julie, testified that these problems limited Flick’s ability to drive and to work.
In contrast, Dejesus’s medical experts, Dr. David Oliveri and Dr. Gerald Dunn, testified that the accident did not cause Flick’s symptoms and that Flick’s medical records did not indicate that she had a brain disorder until one year after the accident. Another physician, Dr. Robert Voy, testified that he treated Flick before the accident for kidney infections, which caused symptoms similar to those complained of after the accident: specifically, nausea, *815 headaches, dizziness and blackout spells or momentary lapses of consciousness.
Flick’s attorney, W. Randall Mainor, presented an emotional and provocative closing argument to the jury, and he injected his personal life and opinions into this argument. Among other things, Mainor personally vouched for the justness of his cause, talked about his grandchildren, his career with the FBI, his twenty years’ experience as a trial lawyer, and even cried during his closing argument. Mainor expressed his disdain for DeJesus, said he was in a better position than the jury to know Flick’s suffering and stated he would not trade the use of his own fingers for ten million dollars. In painting a negative image of Dejesus’s medical experts, Mainor informed the jury that Drs. Dunn and Oliveri were motivated to testify for DeJesus solely by money and that, in his opinion, Dr. Oliveri lied and the jury could discard his testimony in a garbage can. Finally, Mainor invited the jury to punish defense counsel and all civil defense attorneys with its verdict.
The jury returned a verdict of $1,470,000.00. The award included $100,000.00 for future medical expenses, far in excess of the $21,000.00[2] supported by the evidence and well in excess of counsel’s request for $30,000.00 to $35,000.00, and $300,000.00 for future loss of income. The award also included $1,000,000.00 for future pain and suffering, approximately twice the amount counsel requested.
DeJesus moved for a new trial, claiming that Mainor’s misconduct inflamed the jury’s passions and prejudiced the jury’s verdict. The district court denied the motion, concluding that substantial evidence supported the verdict. DeJesus appeals.[3]

DISCUSSION

Under NRCP 59(a)(2) and (6), a district court may grant a new trial based on “[m]isconduct of the jury or prevailing party” or *816 when it appears that “[ejxcessive damages . . . have been given under the influence of passion or prejudice.’ ’ On review, we will not disturb the district court’s ruling on a motion for a new trial absent an abuse of discretion. Southern Pac. Transp. Co. v. Fitzgerald, 94 Nev. 241, 244, 577 P.2d 1234, 1236 (1978).
In Barrett v. Baird, 111 Nev. 1496, 1515, 908 P.2d 689, 702 (1995), we established the standard used to determine whether reversal is warranted by misconduct of the prevailing party’s attorney:
“[t]o warrant reversal on grounds of attorney misconduct, the ‘flavor of misconduct must sufficiently permeate an entire proceeding to provide conviction that the jury was influenced by passion and prejudice in reaching its verdict.’ ” Kehr v. Smith Barney, Harris Upham & Co., Inc., 736 F.2d 1283, 1286 (9th Cir. 1984) (quoting Standard Oil of California v. Perkins, 347 F.2d 379, 388 (9th Cir. 1965)).
The district court may grant a new trial based upon such misconduct without proof that the misconduct changed the outcome of the first trial. Id. (citing Minneapolis, St. Paul & Sault Ste. Marie Ry. Co. v. Moquin, 283 U.S. 520, 521-22 (1931)).
Initially, we note that Dejesus’s attorney failed to object to most of Mainor’s improper arguments. Generally, a failure to object to attorney misconduct precludes review. Southern Pac. Transp., 94 Nev. at 244, 577 P.2d at 1235 (noting that “[t]o preserve the contention for appellate review, specific objections must be made to allegedly improper closing argument”). Nevertheless, in light of the inflammatory quality and sheer quantity of misconduct in this case, review is warranted to prevent plain error. See Bradley v. Romeo, 102 Nev. 103, 104, 716 P.2d 227, 228 (1986) (recognizing that “[t]he ability of this court to consider relevant issues sua sponte in order to prevent plain error is well established”); see also Kaas v. Atlas Chem. Co., 623 So. 2d 525, 526 (Fla. Dist. Ct. App. 1993) (attorney’s expression of his personal opinion that an expert witness is a liar is misconduct warranting a new trial, and no objection is required because such arguments fall squarely within that category of fundamental error in which the basic right to a fair trial has been fatally compromised); Sadler v. Arizona Flour Mills Co., 121 P.2d 412, 413 (Ariz. Ct. App. 1942) (when prevailing party’s attorney’s misconduct during argument is a ground for vacating the verdict, trial court may grant a new trial despite the absence of any objection).
*817 Many of Mainor’s arguments to the jury far exceeded the boundaries of acceptable professional conduct. The record is replete with examples; the following excerpts illustrate the level of impropriety that Mainor exhibited. To begin, Mainor inappropriately accused Dejesus’s expert witness, Dr. Oliveri, of committing perjury and personally attacked his credibility:
I guarantee you if I’d have hired Oliveri, you’d have heard that [Flick] had all these problems. I guarantee you that. If I’d have given him fifteen hundred bucks ($1500.00), he’d have come in and he would have been able to concur with Ford [Flick’s expert]. That’s the way it works. That’s the real world. See, you folks don’t know that. But I’ve been doing this for twenty years and that’s the way it’s done. And—and what they try to do is influence jurors by this nonsense, these IMEs. They’re not independent of anything. They are biased and prejudiced against people who are hurt.
[T]he reason why I put [Flick’s] dad on for the one question, it was to merely show you folks that Oliveri does not—did not tell the truth. I knew I could . . . present evidence that he wasn’t qualified in what he was saying and I knew his opinions wouldn’t hold any water, but I wanted you to—I wanted you to look at him and question his truthfulness.
I was going to have [Flick’s dad] tell more about what he observed there, but all that would have done, I think, is make Oliveri look a little more stupid than I’d already done, and I didn’t think that was necessary. . . . [T]he issue is was [Oliveri] telling the truth and the answer is, no, he wasn’t.
You’re at liberty, if you want, to take Oliveri’s testimony and tear it up and throw it in the garbage can because I think he lied on the stand, didn’t necessarily lie but didn’t totally tell the truth. ... He violated his oath because he told the truth but he didn’t tell the whole truth, and he told a few things other than the truth. His testimony is—is not credible in my estimation.
Mainor improperly interjected his personal opinions about the defendant. He told the jury how much he personally disliked DeJesus because DeJesus nearly killed two people and because he had acquired some sense of Flick’s suffering during preparation for trial:
I have a hard time liking this man. He nearly killed a couple of people. And, you know, I’m not sure that I accept his *818 repentance. I have a forgiving heart. I think I can do that. But I can tell you, I don’t like him. And the reason why I don’t is because you guys have only seen [Flick] for four days. I’ve seen her for nearly two years. I’ve seen her a lot. And you got a little bit of a sense of what she’s been going through. I have a much greater sense of what she’s gone through ‘cause I’ve been with her and been with her family.
Mainor improperly gave his personal opinion as to the justness of Flick’s cause, and that of other plaintiffs claiming injuries. Although he stated to the jury that the case was not a crusade for him, he explained that it was close to a crusade because defense counsel was trying to get the jury to shortchange Flick’s damage claim. Thus, Mainor asked the jury to send a “message” to defense firms in town:
What I’d like the message to be to this law firm and to other law firms is, dang it, when someone is hurt, pay them, pay them what’s reasonable and let’s go on with life. But if you let them get away with this, if you let them get away with bringing some clown like Oliveri in here to try to convince the jury that—that she’s not hurt, they’ll keep doing that. . . . that’s the way the game is played, . . . that’s what happens, that’s what the power brokers of this world do to people like you.
Mainor also impermissibly asked the jurors to place themselves in Flick’s position:
I want you men to listen to these women because . . . there’s things that a woman experiences that you don’t .... [Y]ou’re going to be able to tap in a little bit to their feelings, I think, as to fear. . . . [Flick’s] afraid to be alone. She’s afraid to take a bath because if she gets in the bathtub and she’s sitting there enjoying a bath and has one of these things, she’d go in the water and she’s dead. There’s just hundreds of things like that. She’s afraid . . . that if she gets married ... to have a baby. I mean, think of ... the human suffering that would occur if she gets pregnant and falls down and loses her baby or, worse yet, drops her baby and hurts her baby.
After summarizing the evidence regarding medical expenses and lost income, Mainor told the jury the hard part would be calculating fair and reasonable compensation for Flick’s pain and suffering, and lost job opportunities. Mainor indicated he would not trade places with Flick for ten million dollars and asked the jury:
*819 How do you compensate—well, how do you put a value on not using your fingers? I don’t know. I mean, I don’t know how you do that. ... I wouldn’t take ten million dollars if I had to do this. I like to play golf once in awhile. And if I couldn’t play golf, I mean, I wouldn’t die but I—I just would not do that.
All of these arguments, and others not included here, were improper' and inflammatory, and constituted egregious misconduct. Mainor’s attack on Dr. Oliveri, as well as DeJesus, and his commentary on the virtues of Flick’s cause, blatantly violated SCR 173, which provides that “[a] lawyer shall not . . . state a personal opinion as to the justness of a cause, the credibility of a witness, [or] the culpability of a civil litigant.” See Yates v. State, 103 Nev. 200, 204, 734 P.2d 1252, 1255 (1987) (improper to characterize a doctor’s testimony as “melarky,” “outright fraud” or to accuse the doctor of “crawl[ing] up on the witness stand”); Sipsas v. State, 102 Nev. 119, 125, 716 P.2d 231, 234 (1986) (improper to call a medical expert a “hired gun from Hot Tub Country” and “a living example of Lincoln’s law [who] can fool all of the people enough of the time”); Owens v. State, 96 Nev. 880, 886, 620 P.2d 1236, 1239 (1980) (improper to argue that “I was brought up to believe that there is some good in all of us. For the life of me, on the evidence presented to me, I can’t see the good in [this defendant]”).
Further, Mainor impermissibly asked the jurors to place themselves in Flick’s position when he asked them to “tap into feelings” about Flick’s fears, in light of her physical condition, and to “send a message” to law firms that try to prevent injured persons from recovering (“that’s what the power brokers of this world do to people like you”). We have previously held that such “golden rule” arguments are forbidden because they interfere with the jury’s objectivity. See Boyd v. Pernicano, 79 Nev. 356, 358, 385 P.2d 342, 343 (1963) (improper to ask the jurors to place themselves in the shoes of the victim because such argument interferes with the objectivity of the jury); see also DuBois v. Grant, 108 Nev. 478, 481, 835 P.2d 14, 16 (1992) (golden rule argument is the impermissible suggestion that the jurors trade places with the victim); McGuire v. State, 100 Nev. 153, 158, 677 P.2d 1060, 1064 (1984).
With respect to his “power broker” message, the fact that Mainor did not expressly remind the jury that Flick is “people like you” does not save him from a violation of the golden rule. He clearly asked the jurors to “allow such recovery as they would wish if in the same position.” Moreover, Mainor’s “testimony” during his argument, that he personally would not want to trade *820 ten million dollars for the use of his fingers, violated the golden rule. While making this argument, he asked the jurors, “How do you put a value on not using your fingers?” He thus invited the jury to agree that neither would they make such a trade.
Individually, Mainor’s inappropriate remarks violated well-established standards of professional conduct. Taken cumulatively, Mainor’s improper arguments so thoroughly permeated the proceeding that we are convinced they tainted the entire trial and resulted in a jury verdict that was the product of passion and prejudice. The $1,470,000.00 verdict plainly reflects the influence of counsel’s improper arguments. There is simply no other explanation for it, particularly in light of the conflicting expert testimony regarding Flick’s injuries.[4] The award far exceeds what counsel requested, and there is no objective basis in the record to support it.[5] It is apparent that the jury accepted Mainor’s improper invitation to punish the “power brokers” and send a message to all the defense attorneys who try to shortchange people like Flick and themselves. Given Mainor’s impropriety, DeJesus was deprived of a fair trial.[6]
We therefore conclude that the district court abused its discretion in denying a new trial under NRCP 59(a)(2), misconduct by the prevailing party, and NRCP 59(a)(6), excessive damages awarded “under the influence of passion or prejudice.” *821 Accordingly, we reverse the district court’s judgment and remand for a new trial on damages.[7]
Young and Becker, JJ., concur.

Flick also named her sister Julie as a defendant, but settled with her before trial for $10,000.00.

Letters by Flick’s experts, Dr. Fishman and Dr. Ford, indicated that Flick’s future medical expenses could reach $21,000.00.

DeJesus also contends that a new trial is warranted because the district court abused its discretion by admitting evidence of Dejesus’s intentional conduct during the freeway altercation, as it was irrelevant and prejudicial. We disagree. We conclude that the district court did not abuse its discretion in admitting this evidence as relevant to Flick’s claim for mental pain and suffering. See Southern Pac. Transp. Co. v. Fitzgerald, 94 Nev. 241, 243, 577 P.2d 1234, 1235 (1978) (noting that a district court has broad discretion in deciding whether evidence is admissible); NRS 48.015 (defining relevant evidence); NRS 48.035 (providing that relevant evidence is admissible “if its probative value is [not] substantially outweighed by the danger of unfair prejudice”).

See Boyd, 79 Nev. at 359, 385 P.2d at 343 (concluding that counsel’s inappropriate statements are given more weight when a notable conflict in the evidence exists).

Counsel argued that Flick’s future medical expenses would range between $30,000.00 and $35,000.00, but he miscalculated the total sum supported by the medical evidence; as previously noted, the evidence submitted to the jury supports an award of $21,000.00, at most. The jury disregarded the evidence and awarded Flick $100,000.00 for future medical expenses. Similarly, depending on the method of calculation used, counsel asked for $400,000.00 to $630,000.00 for Flick’s future pain and suffering. The jury awarded $1,000,000.00.

The dissent offers as a possible alternative explanation for the unreliable verdict, that it was solely the result of the jurors’ negative reaction to Dejesus’s road rage conduct. After reading what is characterized in the concurring opinion as a record “replete with instances of serious misconduct by [Mainor] during the summation,” one cannot accept the dissent’s theory. Of course, Dejesus’s conduct was deplorable. And Mainor impermissibly capitalized on those facts to inflame the jury and to incite the jury to decide this case out of moral indignation against DeJesus and a desire to punish him. The verdict was in no way reliable as a reflection of the value of Sherry Flick’s case.

The Honorable Dan L. Papez, Judge of the Seventh Judicial District Court, was designated by the Governor to sit in place of The Honorable A. William Maupin, Justice. Nev. Const. art. 6, § 4.