JAMES GROSJEAN, Appellant/Cross-Respondent, v. IMPERIAL PALACE, INC., and DONNIE ESPENSEN, Respondents/Cross-Appellants.

No. 44542

July 30, 2009 212 P.3d 1068

[Rehearing denied October 20, 2009]

*Nersesian & Sankiewicz* and *Thea Marie Sankiewicz* and *Robert A. Nersesian*, Las Vegas, for Appellant/Cross-Respondent.

*Cooper Levenson April Niedelman Wagenheim, P.A.*, and *Jerry S. Busby*, Las Vegas, for Respondent/Cross-Appellant Imperial Palace, Inc.

*Lewis Brisbois Bisgaard & Smith LLP* and *David L. Thomas*, Las Vegas, for Respondent/Cross-Appellant Donnie Espensen.

*Potter Law Offices* and *Cal J. Potter III* and *Lawrence W. Freiman*, Las Vegas, for Amicus Curiae Nevada Trial Lawyers Association.

## OPINION

By the Court, DOUGLAS, J.:

In this appeal and cross-appeal, we address whether qualified immunity can extend to shield private actors from civil liability in a 42 U.S.C. § 1983 action and, if not, whether alleged evidentiary errors and attorney misconduct that occurred during trial on the § 1983

claim warrant a new trial. In addition to the qualified immunity and alleged trial error issues, we decide whether punitive damages were properly presented to the jury and, if so, whether its subsequent award was supported by the evidence. Finally, we determine whether previously dismissed state law claims should be reinstated against the same private actors against whom a judgment was entered on the § 1983 cause of action, when both the state law- and federal law-based claims were grounded on the same conduct, an allegedly illegal detention.

First, with regard to the private actor cross-appellants' assertion that the § 1983 claim against them should have been dismissed on qualified immunity grounds, after examining policy considerations underlying the qualified immunity doctrine on the disputed facts, we are not persuaded that such immunity extends to protect private actors. Thus, the district court properly refused to dismiss those claims.

Next, addressing cross-appellants' concern that allegedly erroneous evidentiary rulings and attorney misconduct led to the jury's verdict against them, we conclude that the evidentiary rulings in question were within the district court's considerable discretion and that the attorney misconduct in this case, while prevalent, did not override the jury's verdict, which was based on substantial evidence in the damages phase of the trial.

As for the argument on cross-appeal that the district court improperly allowed the punitive damages request to be presented to the jury, even though the punitive damages request was grounded on a state statute and all of the pertinent state law claims had been dismissed, we conclude that the district court properly allowed the request to go forward, as the state standard conforms to federal law requirements governing punitive damage awards in § 1983 actions. With regard to the punitive damages awarded, we conclude that the jury's $500,000 award was a result of continued attorney misconduct, including a "golden rule" violation and improper emotional arguments, such that a new trial is warranted as to punitive damages.

Finally, addressing the appeal, which challenges the dismissal of certain state law claims, because appellant already recovered damages for identical conduct under § 1983, he is precluded from recovering additional damages for that injury under state law-based theories. In particular, because the common law torts for which he seeks to recover coincide substantially with the § 1983 action that he was allowed to maintain and for which a money judgment was entered in his favor, he may not again recover damages for that conduct, and thus we need not further review the district court's decision to dismiss the state law claims against Imperial Palace. Accordingly, we affirm the compensatory damages portion of the

district court's judgment, reverse the punitive damages portion, and remand for a new trial on punitive damages only.

## FACTS AND PROCEDURAL HISTORY

### The complaint

This matter arose from an incident at Imperial Palace casino in Las Vegas, Nevada, when casino security personnel and two Gaming Control Board (GCB) agents detained appellant James Grosjean because he matched the description of a person in whom another GCB agent was interested. According to the complaint later filed in the district court, even though Grosjean was "undertaking no suspicious activity," he was offensively touched, handcuffed, searched, and detained by Imperial Palace security officers.[2] In a proposed amendment to that complaint, Grosjean maintained that the two GCB agents instructed Imperial Palace security staff to detain him, despite lacking reasonable suspicion to do so. According to Grosjean, during the course of his detention, the GCB agents were informed by a third GCB agent that Grosjean was not the suspect for whom the GCB was looking and that he should be released. Nevertheless, Grosjean asserted, the detention continued so that the items removed from Grosjean's person during the patdown search could be further examined.

The relevant allegations in the complaint asserted that the detention was executed without reasonable suspicion and named as a defendant Imperial Palace, among others. Grosjean sought compensatory and punitive damages for false imprisonment, conspiracy, and battery. Later, Grosjean filed a motion that asked, among other things, for leave to amend the complaint to add a claim for federal civil rights violations under 42 U.S.C. § 1983 against, among others, Imperial Palace and Imperial Palace's security supervisor, respondent/cross-appellant Donnie Espensen.

### Pretrial motions

As the case proceeded in the district court, the court granted Imperial Palace's motion to dismiss the state law claims against it, determining that Imperial Palace was entitled to discretionary-function immunity. Thereafter, the district court allowed Grosjean leave to amend the complaint to add a federal law civil rights claim under 42 U.S.C. § 1983 against Imperial Palace and Espensen. Although Imperial Palace and Espensen subsequently moved to dismiss

---

[2]The complaint also contained allegations regarding a detention incident involving Grosjean and another party that occurred at Caesars Palace ten months earlier. Because the allegations concerning the Caesars Palace incident are mostly irrelevant to our decision here, that incident is not fully discussed in this opinion.

and for summary judgment as to that claim, arguing that it was entitled to qualified immunity from § 1983 liability, the district court denied the motion. Thus, the matter proceeded on the remaining claims, including the § 1983 claims against Imperial Palace and Espensen.

Upon Imperial Palace's motion, the district court bifurcated the case as it related to Imperial Palace, and the case went to trial against Imperial Palace and Espensen on the only claims remaining against them, the § 1983 claims.

*The trial on Grosjean's § 1983 claims*

During the trial, testimony revealed that Grosjean was detained by Imperial Palace security personnel because he matched the description of a suspect being pursued by GCB agent Paul Stolberg. Grosjean testified that an Imperial Palace security guard instructed him to stop, and when Grosjean kept walking, the security guard grabbed his arm, "kind of pushed [Grosjean's] face into the side [of] the wall," and handcuffed him. After being escorted to a security office, Grosjean was searched. The search revealed that Grosjean was wearing two pairs of pants containing a large sum of money (mostly $100 bills), chips from various casinos, and two sets of identification, one bearing a false identity.

Espensen testified that because the GCB agents on the premises had not been able to reach agent Stolberg, they asked Espensen to delay Grosjean without letting Grosjean know of the GCB's involvement. Espensen explained to Grosjean that he would be let go if it was confirmed that he was not a suspect. Upon Espensen's return to the surveillance room, a GCB agent advised that he had reached agent Stolberg, who instructed the agents to release Grosjean, but because the agents wished to examine the contents of Grosjean's pockets more closely, Grosjean was not immediately released. According to Espensen, because the agents did not want to reveal their involvement, Espensen suggested that they act as though they were Imperial Palace employees. The GCB agents did so, and after viewing Grosjean's belongings, they left the room. Testimony indicated that Grosjean ultimately was detained for approximately 20 minutes beyond when the agents had been instructed to release him.

On redirect examination of Grosjean, Grosjean's attorney posed a rhetorical question, "We know Don Espensen can lie, don't we?" Imperial Palace objected to the question as being argumentative, and the court sustained the objection. While Imperial Palace's expert witness was testifying on direct examination about the reasonableness of Grosjean's detention, Grosjean's attorney commented that "[p]olice officers always say, 'I didn't violate the Fourth Amendment,' even when they're violating it, and we know that." The court asked Grosjean's attorney whether he was arguing or object-

ing, to which the attorney responded that he was objecting to the form of the question asked of the expert. The court sustained the objection.

After the jury was excused, Imperial Palace orally moved for an NRCP 41(b) involuntary dismissal as to Grosjean's request for punitive damages, explaining that, because all of the state law tort claims had been dismissed, there was no basis to support Grosjean's request, which was grounded on a state statute, NRS 42.005. The court deferred ruling on the motion. When the jury returned to the courtroom, the court issued the jury instructions, including that the jury may, at its discretion, award punitive damages if it found, by clear and convincing evidence, fraud, oppression, or malice with respect to the conduct upon which the jury based any finding of liability.

Closing arguments followed, during which Grosjean's attorney explained to the jury that its decision was so important because it would give parties in the same position as Imperial Palace the "impression" that these kinds of cases "can get settled really quick or not—and nothing goes to court and people don't have their lives upset." Imperial Palace's attorney then asked to approach the bench, which the court allowed. During this sidebar conference, according to Imperial Palace, it objected to Grosjean's reference to settlement and moved for a mistrial or at least an admonition to the jury, which, according to Imperial Palace, the district court denied. Continuing with his closing argument, Grosjean's attorney explained that he did not want to "pick on" security guards because "one of the things that makes some of this hard for me is my mother's life was saved by [security guards]." According to Imperial Palace, Grosjean's attorney started crying when he said this; no objection was raised, however.

Grosjean's attorney later stated that the kind of unconstitutional behavior that Imperial Palace engaged in has to be stopped because

> I don't want my daughters or your daughters or sons or the rest of us to have to be going through this and wondering why, when we've done nothing, we're getting told we're going to get our heads banged against the wall. . . . You heard the other lawyer stand up and object because he was afraid you were going to hear [that Imperial Palace violated Grosjean's constitutional rights] and he knew what was coming.

Imperial Palace objected, arguing that it was improper to imply that its earlier objection was made because it was afraid of the evidence. After initially arguing that his comment was proper, Grosjean's attorney then apologized, acknowledging that an objection is not evidence upon which he could comment.

Also during closing argument, Grosjean's attorney (while crying, according to Imperial Palace) described Imperial Palace's conduct as

"tyranny" and informed the jury, "this is where [the tyranny] has to stop. Please protect our Constitution. Please." In explaining to the jury why he gets emotional, Grosjean's attorney stated,

> Every time I think about a violation of constitutional rights, I get butterflies. I get angry. You saw me yell a couple of minutes ago. . . . [I]t's what I do, because I so passionately believe in this, and I think you saw that [Grosjean's] passion matches, if not surpasses mine.

No objection was made to these comments.

Before the punitive damages portion of the trial began, Imperial Palace renewed its motion to dismiss as to Grosjean's request for punitive damages. The court again deferred ruling on the motion. The jury subsequently returned a general verdict against Imperial Palace for $99,000 and against Espensen for $9.

### The punitive damages phase of the trial

The court then asked the jury if it found any defendant liable for punitive damages, and the jury responded yes, as to Imperial Palace only. The court instructed the parties to submit briefs on the punitive damages request, and after a hearing, it allowed the punitive damages portion of the trial to proceed.

During argument, Grosjean's attorney stated, "I frankly—I would hope the Court would agree that a company that makes over $7 million and gives back a grand total of $3,026 [to] charity needs to be told firmly . . . ." At that point Imperial Palace objected and moved to strike. The court sustained the objection, ordered the statement stricken, and instructed the jury to disregard the statement. Grosjean's attorney then argued that a person should not follow a police officer's instructions to do something illegal, pausing in the middle of his statement to explain, "the emotion is getting over me again," at which time, according to Imperial Palace, Grosjean's attorney began crying again.

The jury later returned a verdict, awarding Grosjean punitive damages, which verdict the court sealed at Imperial Palace's request. At the hearing later that week, the district court denied Imperial Palace's motion to dismiss as to the punitive damages request, and the punitive damages verdict was then unsealed, revealing a $500,000 award in favor of Grosjean. The court remitted the award to $300,000 pursuant to statute. Imperial Palace moved for judgment as a matter of law (JNOV), or, in the alternative, a new trial and remittitur. The court summarily denied the JNOV and new trial motions and summarily granted the request for remittitur, reducing the punitive damages award to $150,000. The district court then certified as final its amended judgment, which included an attorney fees and costs award in favor of Grosjean. Grosjean appealed, challeng-

ing the dismissal of his state law claims against Imperial Palace, and Imperial Palace and Espensen cross-appealed asserting that they are entitled to qualified immunity and that various trial errors warranted reversal of the district court's amended judgment.

## DISCUSSION

In resolving this matter, we first address whether Imperial Palace and Espensen were entitled to qualified immunity from liability on Grosjean's § 1983 claims, based on their assertions that they were acting at the direction of the GCB agents when detaining Grosjean. Next, we resolve the issues regarding evidentiary rulings and attorney misconduct, and whether those alleged trial errors warrant a new trial. We then address Imperial Palace's argument that the district court improperly permitted Grosjean to seek punitive damages under state law even though his state law claims had been dismissed. After concluding that punitive damages were properly presented to the jury, we next determine whether the punitive damages award was a result of any trial errors or attorney misconduct, warranting a new trial on punitive damages. Finally, given that Grosjean recovered for the unlawful detention under § 1983, we decide whether he should be allowed to proceed with his state law claims against Imperial Palace, which were grounded on the same allegations that his detention was unlawful.

*Motion to dismiss § 1983 claim against Imperial Palace and Espensen*

On cross-appeal, Imperial Palace and Espensen argue that, as private corporate actors carrying out the GCB's instructions, qualified immunity should have applied to shield them from Grosjean's § 1983 claim.

This court reviews conclusions of law, such as those involving statutory construction, de novo. *Martinez v. Maruszczak*, 123 Nev. 433, 438, 168 P.3d 720, 724 (2007). Alleged constitutional violations by a corporation generally do not provide a plaintiff with a private cause of action against the corporation under § 1983, unless the plaintiff can show that the corporation's actions were fairly attributable to the state. *See Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 924 (1982). In this case, however, Imperial Palace and Espensen do not argue that their actions cannot be attributed to the state. Instead, they contend that their actions are so attributable to the state as to afford them qualified immunity from suit.

Generally, qualified immunity applies to protect ''state officials from civil liability for damages resulting from discretionary acts, so

long as those acts do not violate clearly established statutory or constitutional rights.'' *Butler v. Bayer*, 123 Nev. 450, 458, 168 P.3d 1055, 1061 (2007). Relevant to whether qualified immunity applies to private parties, the United States Supreme Court, in *Richardson v. McKnight*, considered whether prison guards employed by a private corporation should enjoy qualified immunity from suit in a § 1983 case. 521 U.S. 399, 401-04 (1997). In reaching the conclusion that the private prison guards were not entitled to qualified immunity protections, the Court examined historical practices and the public policy considerations underlying the qualified immunity doctrine. *Id.* at 404-12. Recognizing that the qualified immunity doctrine serves the purposes of protecting the public from unwarranted timidity on the part of public officials, ensuring that qualified candidates are not deterred from entering public service, and reducing the chance that lawsuits will detract public officials from their duties, the Court reasoned that these purposes would not be served by extending qualified immunity to private prison guards. *Id.* at 410-12. The Court expressly limited its holding to the facts of that case, however, noting that the immunity question was narrowly answered in the context of a private for-profit firm organized to manage an institution with limited direct supervision by the government. *Id.* at 413. The Court explained that its holding did not bear on the application of qualified immunity in cases ''involv[ing] a private individual briefly associated with a government body, serving as an adjunct to government in an essential governmental activity, or acting under close official supervision.'' *Id.*

Applying the legal principles set forth in *Richardson*, we cannot conclude that the qualified immunity doctrine shields Imperial Palace and Espensen from liability. Imperial Palace, acting through its employees, is a private for-profit corporation that performs independently of the government, is subject to market pressures and competes with other casinos, and engages in operational and administrative tasks with limited direct supervision by the government. *See id.* at 409. Thus, the policy considerations underlying qualified immunity noted above would not be served by permitting Imperial Palace and Espensen to assert qualified immunity. *Id.* at 409-10 (noting that competitive pressures create incentives for private organizations to avoid lawsuits and increase profits, and that these pressures, which are not present in the public sector, provide private firms with ''strong incentives to avoid overly timid, insufficiently vigorous, unduly fearful, or 'nonarduous' employee job performance''). Moreover, there is no firmly rooted historical basis supporting extending qualified immunity to casinos and their employees. *Id.* at 404-05.

Although Imperial Palace and Espensen argue that they served as the GCB's adjunct and under its close supervision in the essential

governmental activity of preventing crime, Grosjean maintained that Imperial Palace and Espensen acted independently. In light of the factual disputes, even though qualified immunity was not available to Imperial Palace and Espensen, we note that the district court properly allowed them to assert a good-faith defense to liability for damages associated with Grosjean's § 1983 claim, *see id.* at 413-14 (rejecting the argument that qualified immunity should apply to shield private prison guards but leaving open the possibility of a good-faith defense); *Clement v. City of Glendale*, 518 F.3d 1090, 1097 (9th Cir. 2008), which defense, if accepted by the jury, would have served to insulate Imperial Palace and Espensen by providing them with protections similar to qualified immunity. *See Jordan v. Fox, Rothschild, O'Brien & Frankel*, 20 F.3d 1250, 1276 (3d Cir. 1994); *Wyatt v. Cole*, 994 F.2d 1113, 1120 (5th Cir. 1993); *Duncan v. Peck*, 844 F.2d 1261 (6th Cir. 1988). The good-faith defense may apply to private parties who become liable solely because of their compliance with government agents' request or in attempting to comply with the law. *See Clement*, 518 F.3d at 1097. Accordingly, under *Richardson*, we perceive no error in the district court's decision to deny Imperial Palace's and Espensen's motion to dismiss Grosjean's § 1983 claim on qualified immunity grounds and instead allowing a good-faith defense. *Buzz Stew, LLC v. City of N. Las Vegas*, 124 Nev. 224, 228, 181 P.3d 670, 672 (2008) (recognizing that a "complaint should be dismissed only if it appears beyond a doubt that [the plaintiff] could prove no set of facts, which, if true, would entitle [the plaintiff] to relief").

*Imperial Palace's and Espensen's motion for judgment notwithstanding the verdict, or, alternatively, a new trial*

### Evidentiary rulings

On cross-appeal, Imperial Palace and Espensen maintain that the district court improperly excluded evidence as to the totality of the circumstances surrounding Grosjean's detention, including evidence of Grosjean's gaming knowledge and reputation as a skilled gambler, which evidence, if allowed, would have supported their argument that Grosjean had a lowered expectation of privacy while in the casino and, consequently, that his Fourth Amendment rights were not violated by his detention. *See United States v. Santana*, 427 U.S. 38, 42 (1976) (explaining that persons in public places have a lower expectation of privacy than persons in their homes); *M & R Investment Co. v. Mandarino*, 103 Nev. 711, 719, 748 P.2d 488, 493 (1987) (noting that a gaming patron who was in disguise and winning a great deal of money within a short period of time due to his card-counting skills did not have a reasonable expectation that casino personnel would not investigate by requesting identification or even detaining him for questioning after he fled the premises). Thus, Imperial Palace and Espensen argue that the district court abused its

discretion by denying their motion for judgment notwithstanding the verdict or for a new trial, which was grounded in part on improperly excluded evidence. They also argue that the court abused its discretion by allowing hearsay testimony, over objection, regarding a security guard's alleged threats to Grosjean.

[Headnotes 6-10]

Decisions concerning motions for judgment notwithstanding the verdict or for a new trial rest within the district court's sound discretion and will not be disturbed absent abuse of that discretion. *Southern Pac. Transp. Co. v. Fitzgerald*, 94 Nev. 241, 244, 577 P.2d 1234, 1236 (1978). NRCP 50(b) allows a party to renew a motion for judgment as a matter of law, notwithstanding the verdict, after trial. Such a directed verdict may be entered when " 'the evidence is so overwhelming for one party that any other verdict would be contrary to the law.' " *M.C. Multi-Family Dev. v. Crestdale Assocs.*, 124 Nev. 901, 910, 193 P.3d 536, 542 (2008) (quoting *Bliss v. DePrang*, 81 Nev. 599, 602, 407 P.2d 726, 727-28 (1965)). Under NRCP 59(a)(1), a new trial may be granted in the event of irregularity in the jury proceedings. Thus, a court may direct a verdict in the moving party's favor or grant a new trial if, as a matter of law, the jury could not have reached the conclusion that it reached. *See Fox v. Cusick*, 91 Nev. 218, 220, 533 P.2d 466, 467 (1975). As for Imperial Palace's and Espensen's evidentiary concerns, we will not overturn the district court's decision to exclude relevant evidence unless we are convinced that the district court abused its discretion. *Hansen v. Universal Health Servs.*, 115 Nev. 24, 27, 974 P.2d 1158, 1160 (1999). In terms of admissible testimony, "[a] statement merely offered to show that the statement was made and the listener was affected by the statement, and which is not offered to show the truth of the matter asserted, is admissible as non-hearsay." *Wallach v. State*, 106 Nev. 470, 473, 796 P.2d 224, 227 (1990).

In this case, the district court reasonably allowed Imperial Palace and Espensen to question Grosjean about his gambling behaviors, including disguise methods, and his gaming expertise. When Grosjean was asked whether his disguise methods were "something that a cheater might do," the district court sustained Grosjean's objection, since Grosjean was not seen doing anything suspicious at Imperial Palace when he was stopped by security, but instead he was stopped because he fit a GCB suspect's description.

With respect to the "smack his head into the wall" statement that an Imperial Palace security guard allegedly made after Grosjean was seized and while he was being taken to a security

room, Grosjean testified that it caused Grosjean to be fearful, since he had a propensity for retinal detachment. Thus, arguably, the statement was introduced to show its effect on Grosjean, and not for its truth.

Accordingly, the district court acted within its discretion in sustaining Grosjean's objection to the "cheater" testimony and in allowing Grosjean to testify about the security guard's statement. Further, since the other testimony and evidence revealed that the GCB agents and Imperial Palace security continued to detain Grosjean after they had confirmed that he was not a suspect, there was sufficient evidence for the § 1983 claim to go to the jury. Thus, the district court did not abuse its discretion by denying the renewed motion for judgment as a matter of law. For similar reasons, the district court acted within its discretion by denying the new trial motion, since it was possible, based on the testimony and evidence, for the jury to conclude that Grosjean's constitutional rights were violated.

### Attorney misconduct

Also on cross-appeal, Imperial Palace and Espensen contend that it was improper for Grosjean's attorney to inject his personal life into the trial by referring to his marriage, discussing his hometown during voir dire, stating that security guards saved his mother's life, and explaining that he did not want his daughters or the jury's daughters or sons to have to go through the type of experience that Grosjean had been through. According to Imperial Palace, Grosjean's attorney cried several times during the trial, again personalizing the matter. Imperial Palace and Espensen point out that Grosjean's attorney improperly mentioned the parties' settlement efforts, which were not in evidence, implying that Imperial Palace unreasonably failed to settle the case. They also assert that Grosjean's attorney impermissibly vouched for Grosjean's cause, by stating that police always say that they did not violate the Fourth Amendment, and also impermissibly vouched for Grosjean, by explaining that he had known Grosjean for two years and that he knew that Grosjean's emotion on the witness stand was real. Finally, Imperial Palace and Espensen contend that Grosjean's attorney displayed improper disdain toward them and their witnesses, pointing to his comment that Espensen was a liar, references to Imperial Palace's arguments as "smoke and mirrors," calling the security personnel names such as "rent-a-cops" and "goons," and referring to Imperial Palace's expert witness's testimony as "garbage."

Grosjean responds that Imperial Palace and Espensen waived any misconduct argument by not timely objecting in the district court. Regardless, he asserts, no attorney misconduct occurred in this

case, any personal fact statements were innocuous, and exhibiting passion and showing disdain for the opposing side is permissible. Grosjean asserts that the record does not disclose that his attorney cried, although his attorney admits that "his voice cracked a few times."

Whether an attorney's comments are misconduct is a question of law, subject to de novo review. *Lioce v. Cohen*, 124 Nev. 1, 20, 174 P.3d 970, 982 (2008). Still, we give deference to the district court's factual findings and to how it applied the standards to those facts. *Id.* Although counsel "enjoys wide latitude in arguing facts and drawing inferences from the evidence," *Jain v. McFarland*, 109 Nev. 465, 476, 851 P.2d 450, 457 (1993) (citation omitted), counsel nevertheless may not make improper or inflammatory arguments that appeal solely to the emotions of the jury. *See DeJesus v. Flick*, 116 Nev. 812, 819, 7 P.3d 459, 464 (2000), *overruled on other grounds by Lioce*, 124 Nev. 1, 174 P.3d 970; *Barrett v. Baird*, 111 Nev. 1496, 1514, 908 P.2d 689, 701-02 (1995), *overruled on other grounds by Lioce*, 124 Nev. 1, 174 P.3d 970.

We recently redefined, in *Lioce v. Cohen*, 124 Nev. 1, 174 P.3d 970, when a new trial is warranted based on attorney misconduct. In that case, we explained that when a party objects to purported misconduct and that objection is sustained, reversal is warranted only if the misconduct is so extreme that the objection and admonishment could not remove the misconduct's effect. *Id.* at 17, 174 P.3d at 981. When a party fails to object to attorney misconduct during the trial, however, we will reverse the judgment only when the misconduct amounted to "irreparable and fundamental error . . . that results in a substantial impairment of justice or denial of fundamental rights such that, but for the misconduct, the verdict would have been different." *Id.* at 19, 174 P.3d at 982. That standard essentially amounts to plain error review, under which the party claiming misconduct must show " 'that no other reasonable explanation for the verdict exists.' " *Id.* (quoting *Ringle v. Bruton*, 120 Nev. 82, 96, 86 P.3d 1032, 1041 (2004)). This covers the rare occasion when the attorney misconduct "offsets the evidence adduced at trial in support of the verdict." *Id.*

Here, the statements to which Imperial Palace assigns error amounted to misconduct. *See id.* at 20-23, 174 P.3d at 982-84 (explaining that it is impermissible for an attorney to make a so-called golden rule argument by asking the jurors to place themselves in plaintiff's position or to nullify the jury's role by asking it to instead "send a message" to the defendant); *see also* RPC 3.4(e) (explaining that it is improper for a lawyer to offer a personal opinion as to the justness of a cause, the credibility of a witness, or the culpabil-

ity of a civil litigant). Grosjean's attorney's comments during witness examination, during closing argument, and later during the punitive damages portion of the trial encouraged the jurors to look beyond the law and the relevant facts in deciding the issue before them. Whether that misconduct warrants a new trial, we examine under the *Lioce* standards.

From the record, we discern that Imperial Palace objected to three of the challenged statements.[3] The district court sustained all three objections, and in one of those instances it struck the statement and admonished the jury not to consider it. Imperial Palace, as the party moving for a new trial, bore the burden of demonstrating that the misconduct was so extreme that the objection and admonishment were ineffective in removing the misconduct's effect. *Lioce*, 124 Nev. at 17, 174 P.3d at 981. With regard to the liability and compensatory damages phase of the trial, it did not meet that burden.

And although most of the unobjected-to statements that Imperial Palace challenges here likewise were improper, those statements did not amount to misconduct rising to a level of irreparable and fundamental error requiring reversal. In analyzing attorney misconduct in the context of an appeal from an order denying a new trial motion, we look at the scope, nature, and quantity of misconduct as indicators of the verdict's reliability. *Id.* at 17, 174 P.3d at 980. While the cumulative effect of such conduct is therefore relevant, under *Lioce*'s unobjected-to review standard, Imperial Palace must demonstrate that no other reasonable explanation for the verdict exists. That it failed to do.

Instead, the testimony and evidence adduced during the five-day trial reasonably could support the verdict rendered here. The jury awarded Grosjean $99,000 in compensatory damages for a 45-minute detention, during which no physical injury occurred, and while Imperial Palace argues that the award was excessive and could be based on nothing other than attorney misconduct and erroneous exclusion of evidence, we disagree. Both Grosjean and Imperial

---

[3]In particular, the court sustained objections that were made after Grosjean's attorney (1) stated that Imperial Palace earlier had objected to certain testimony because it was "afraid" the jury would hear damaging information, (2) argued that Imperial Palace should be penalized with punitive damages for its failure to make significant charitable contributions, and (3) stated that Espensen lied.

Although Imperial Palace asserts that it objected, at sidebar, when Grosjean's attorney improperly referred to settlement negotiations by implying that the jury had to sit through the trial because Imperial Palace failed to reach a settlement, and that the district court overruled the objection, Imperial Palace neglected to make a proper record of any such objection. Thus, that statement will be reviewed under the standard that applies for unobjected-to misconduct.

Palace presented numerous witnesses and evidence during the trial, and credibility determinations and the weighing of evidence are left to the trier of fact. *See El Dorado Hotel v. Brown*, 100 Nev. 622, 626, 691 P.2d 436, 440 (1984), *overruled on other grounds by Vinci v. Las Vegas Sands*, 115 Nev. 243, 246, 984 P.2d 750, 752 (1999). Since we assume that the jury believed all of the evidence favorable to Grosjean, drawing reasonable inferences therefrom, *see First Interstate Bank v. Jafbros Auto Body*, 106 Nev. 54, 56, 787 P.2d 765, 767 (1990), *abrogated on other grounds by Countrywide Home Loans v. Thitchener*, 124 Nev. 725, 743, 192 P.3d 243, 255 (2008), we cannot conclude that the jury's verdict as to liability and compensatory damages for emotional harm was derivative solely of the attorney misconduct or that the evidence was offset by the comments from Grosjean's attorney. Accordingly, we perceive no abuse of discretion in the district court's decision to deny Imperial Palace's new trial motion on misconduct grounds as to the liability and compensatory damages phase of the trial.

As explained below, however, we cannot conclude that the jury's $500,000 punitive damage award, which was $300,000 more than Grosjean had requested, was not a product of attorney misconduct, rising to a level warranting reversal. *Lioce*, 124 Nev. at 17-18, 174 P.3d at 981 (explaining that when misconduct is so extreme that a sustained objection and admonishment are insufficient to remove the misconduct's effect, a new trial is warranted).

### Punitive damages

#### Motion for a directed verdict

On cross-appeal, Imperial Palace argues that the district court erred when it deferred ruling on its directed verdict motion until after the jury returned its punitive damages verdict. According to Imperial Palace, the district court's delay prevented Imperial Palace from properly presenting its punitive damages defense because there remained a question as to whether the court would allow the jury to consider punitive damages. Thus, it argues, any evidence it may have presented in opposition to punitive damages would have been objectionable.

Here, although the court delayed in ruling on the motion, it is not clear that the delay prevented Imperial Palace from presenting evidence to negate an award of punitive damages. Regardless, although Imperial Palace inquired about the status of its motion, it was complacent in the delay, since it never objected to the court's deferral of its ruling. The district court in this case requested supplemental briefing on the punitive damages matter, and the court subsequently held a hearing to determine whether Grosjean would be allowed to request punitive damages. Although the jury had already been in-

structed on punitive damages and returned a verdict in Grosjean's favor, nothing within NRCP 50(a) requires the district court to rule on a directed verdict motion before the jury returns a verdict.[4] At any rate, we perceive no prejudicial error that would support overturning the district court's decision to deny the motion.

*Standard for awarding punitive damages in a § 1983 action*

Imperial Palace argues that the court improperly allowed Grosjean to pursue his punitive damage request under NRS 42.005, when his only remaining claim against Imperial Palace was based on a federal civil rights violation under § 1983. Imperial Palace asserts that there was no evidence that it acted with evil motive or reckless indifference to support a § 1983 punitive damage award, also arguing that it was error for the court to allow Grosjean to assert NRS 42.005's malice standard, especially when he did not plead malice.

Grosjean argues that Imperial Palace mischaracterizes punitive damages as a claim under NRS 42.005, when it is simply a remedy that was always before the court and did not evaporate with the dismissal of his state law claims. Grosjean maintains that it was appropriate to apply state punitive damages law, *i.e.*, NRS 42.005, in a federal § 1983 action, especially since Nevada law requires a higher degree of misconduct to support a punitive damages award than does federal law, so that Imperial Palace suffered no prejudice from the NRS 42.005 instruction.

The United States Supreme Court set forth the requisite mental state and conduct that a jury must find to award punitive damages in a § 1983 action in *Smith v. Wade*, 461 U.S. 30, 38 (1983). In considering whether punitive damages under § 1983 were limited to intentionally malicious conduct, the Court recognized that federal and state courts generally "permitted punitive awards on variously stated standards of negligence, recklessness, or other culpable conduct short of actual malicious intent." *Id.* at 45. Reasoning that there was "no reason why a person whose federally guaranteed rights have been violated should be granted a more restrictive remedy than a person asserting an ordinary tort cause of action," *id.* at 48-49, the Supreme Court concluded that a jury may assess punitive damages in a § 1983 action when the "defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others." *Id.* at 56.

---

[4]According to Grosjean, Imperial Palace never moved for a directed verdict under NRCP 50(a) but instead reserved its earlier NRCP 41(b) motion for an involuntary dismissal. Regardless, the standards for reviewing orders resolving either motion are the same, *Nelson v. Heer*, 123 Nev. 217, 222-23, 163 P.3d 420, 424 (2007), and whether Imperial Palace challenged the punitive damages under NRCP 41(b) or NRCP 50(a) is not material to our decision here.

In analyzing whether a punitive damage request in a § 1983 action was presented to the jury under the appropriate instruction, the Ninth Circuit concluded in *Dang v. Cross*, 422 F.3d 800, 805, 808 (9th Cir. 2005), that a § 1983 plaintiff's proposed jury instruction that punitive damages could be awarded if the defendant's acts or omissions were "callously or, maliciously, or wantonly, or oppressively done," was within the scope of the standard set by *Smith*. The United States Court of Appeals for the Ninth Circuit concluded that a jury instruction that allows for imposing punitive damages for an act that caused the plaintiff's injury, and was " 'oppressively done,' " was " 'accurate and complete.' " *Dang* at 808 (quoting *McKinley v. Trattles*, 732 F.2d 1320, 1326 (7th Cir. 1984)); *see also Walker v. Norris*, 917 F.2d 1449, 1459 (6th Cir. 1990) (affirming an award of punitive damages in a § 1983 action, concluding that the "maliciously, wantonly, or oppressively done" jury instruction was "as strict as the standard articulated by the Supreme Court in *Smith v. Wade*"); *Garza v. City of Omaha*, 814 F.2d 553, 556 (8th Cir. 1987) (explaining that punitive damages may be awarded in a § 1983 action if the "defendant exhibits oppression, malice, gross negligence, willful or wanton misconduct, or reckless disregard for the civil rights of the plaintiff"); *Stokes v. Delcambre*, 710 F.2d 1120, 1126 (5th Cir. 1983) (concluding that in the § 1983 context, malicious, wanton, or oppressive acts are within the traditional tort punitive damages standards as required by *Smith v. Wade*).

Here, the jury was instructed under NRS 42.005, which provides that punitive damages may be recovered if the plaintiff proves "by clear and convincing evidence that the defendant has been guilty of oppression, fraud or malice." Applying the standards set forth in *Smith*, and *Dang*, we conclude that the district court properly instructed the jury that oppression, fraud, or malice can serve as a basis for a punitive damages award in a § 1983 action.

### Attorney misconduct

As explained above, attorney misconduct occurred throughout the underlying proceeding and the cumulative effect of that conduct on the jury's verdict is relevant in analyzing whether a new trial is warranted. *Lioce*, 124 Nev. 17, 174 P.3d at 980 (recognizing that "the scope, nature, and quantity of misconduct are themselves relevant to whether the verdict is reliable"). During the punitive damages phase of the trial, Grosjean's attorney essentially asked the jury to send a message to Imperial Palace by punishing it with punitive damages for not making substantial charitable contributions, despite being a highly profitable corporation. As explained in *Lioce*, attorneys violate the "golden rule" by asking the jurors to place themselves in

the plaintiff's position or nullify the jury's role by asking it to "send a message" to the defendant instead of evaluating the evidence. *Lioce*, 124 Nev. at 20-23, 174 P.3d at 982-84; *see also* RPC 3.4(e) (providing that professional conduct standards prohibit an attorney from offering personal opinions regarding the justness of a cause or the culpability of the defendant). Although the district court sustained Imperial Palace's objection and struck the statement, Grosjean's attorney proceeded to argue that Imperial Palace should not have followed the GCB agents' instructions to do something illegal, pausing in the middle of his statement to explain, "the emotion is getting over me again," while crying, according to Imperial Palace. Imperial Palace did not object, but as pointed out in *Lioce*, "when . . . an attorney must continuously object to repeated or persistent misconduct, the nonoffending attorney is placed in the difficult position of having to make repeated objections before the trier of fact, which might cast a negative impression on the attorney and the party the attorney represents, emphasizing the improper point." *Id.* at 18, 174 P.3d at 981.

Here, there is a combination of objected-to and sustained and unobjected-to attorney misconduct. With regard to objected-to and sustained misconduct, the party seeking a new trial must demonstrate that the misconduct is so extreme that a sustained objection and admonishment are insufficient to remove the misconduct's effect. With regard to unobjected-to misconduct, the moving party must show "a substantial impairment of justice or denial of fundamental rights such that, but for the misconduct, the verdict would have been different." *Id.* at 19, 174 P.3d at 982. Another factor to consider when evaluating attorney misconduct is that, while a single instance of improper conduct might be cured by objection and admonishment, the same may not hold true when the improper conduct is repeated. *Id.* at 19, 174 P.3d at 981. Bearing in mind that Grosjean suffered no physical injuries and was not jailed, but instead was detained in a security office for 45 minutes, the jury's $500,000 punitive damage verdict appears driven not by evidence of malice, fraud, or oppression, but instead by Grosjean's attorney's improper golden rule and emotional arguments. Thus, having considered Grosjean's attorney's statements and behavior in light of the *Lioce* standards, we conclude that the misconduct in this matter is so egregious as to warrant a new trial on punitive damages.

### Remittitur

Although Grosjean argues that, by summarily remitting the punitive damages award and failing to make any finding that the award was excessive, the court erred as a matter of law, in light of our conclusion that the attorney misconduct in this matter warrants a new

trial as to punitive damages, we need not address Grosjean's argument in that regard.

### Dismissal of the state law claims against Imperial Palace

Grosjean argues that because the Legislature has provided immunity only to governmental agencies, the district court improperly allowed Imperial Palace to avail itself of NRS 41.032(2)'s protections, under which the State and its agents who exercise or fail to exercise discretionary functions are entitled to immunity from tort liability. Imperial Palace, on the other hand, argues that because its security guards were acting at the GCB agents' direction, it should be entitled to the same discretionary-function immunity protection that applies to shield the GCB agents from liability.

Our resolution of this particular issue is not necessary here. Grosjean was allowed to proceed with his § 1983 claim against Imperial Palace, with the jury awarding him $99,000 in compensatory damages. The invasion of Grosjean's Fourth Amendment rights, on which his § 1983 claim was predicated, has fundamental elements in common with the dismissed state law tort claims. Thus, the general rule against double satisfaction for a single injury precludes any further litigation against Imperial Palace on claims arising from Imperial Palace security guards' acts of searching and detaining Grosjean. *See Kassman v. American University*, 546 F.2d 1029, 1033-34 (D.C. Cir. 1976) (noting that a plaintiff can recover no more than the loss actually suffered); *Zarcone v. Perry*, 434 N.Y.S.2d 437, 439-43 (App. Div. 1980) (upholding the dismissal of the plaintiff's common law tort claims, which included false arrest, defamation, and intentional infliction of mental and physical injury, in part because the plaintiff already had recovered adequate damages in a § 1983 action on the same facts constituting the injury, thus precluding further recovery).

Grosjean asserted claims against Imperial Palace for conspiracy, battery,[5] and false imprisonment.[6] His conspiracy claim was grounded on allegations that casinos, including Imperial Palace, rely on false information contained in a publication about professional gamblers, that casinos fabricate bases for arresting and prosecuting gamblers engaged in lawful gaming activities, and that casi-

---

[5]With regard to his battery claim, Grosjean alleged that Imperial Palace security guards, in the process of detaining him, offensively and oppressively touched and/or handcuffed him without cause for doing so, and that as a result, he was damaged through outrage, loss of freedom, and emotional distress.

[6]In a proposed amended complaint, Grosjean also sought to add a libel and slander claim against Imperial Palace. To the extent that Grosjean challenges the district court's decision to deny leave to amend as to that claim, we perceive no abuse of discretion in that decision.

nos deter lawful gaming activities through intimidation, threats, false imprisonment, and battery. According to the complaint, the detention and "battery" at the Imperial Palace was part and parcel of, and in furtherance of, the conspiracy to exclude professional gamblers from participating in gaming activities. The battery and false imprisonment claims likewise were based on allegations that Imperial Palace's security guards apprehended, detained, and searched Grosjean without legal grounds, *i.e.*, reasonable suspicion or probable cause, for doing so. While those claims were dismissed, he was allowed to amend his complaint to assert a § 1983 claim, which claim proceeded to trial, resulting in a judgment in his favor.

The purpose for allowing the recovery of money damages in a § 1983 action for the violation of a constitutional right, like that of common law tort damages, is to compensate the plaintiff for his or her injury caused by the defendant's breach of duty or intentional tort. *Woodward & Lothrop v. Hillary*, 598 A.2d 1142, 1147 (D.C. Cir. 1991) (citing *Memphis Community School Dist. v. Stachura*, 477 U.S. 299, 306-07 (1986), and *Carey v. Piphus*, 435 U.S. 247, 266 (1978)). The United States Supreme Court has instructed courts to look first to common law tort rules that apply to recovering pecuniary and nonpecuniary loss when determining the elements of damages that may be recovered in a § 1983 action. *Carey*, 435 U.S. at 257-58. In that regard, the Supreme Court has explained that, "whatever the constitutional basis for § 1983 liability, such damages must always be designed 'to compensate injuries caused by the [constitutional] deprivation,' " *Stachura*, 477 U.S. at 309 (quoting *Carey*, 435 U.S. at 265), which "leaves no room for noncompensatory damages measured by the jury's perception of the abstract 'importance' of a constitutional right." *Id.* at 309-10.

In a case that has some similar factual elements as the present matter, the New York Supreme Court, Appellate Division, concluded that a plaintiff who already had recovered damages in a § 1983 action was precluded from bringing an action to recover damages for state law torts based on the same negligent or wrongful conduct of the defendants. *Zarcone v. Perry*, 434 N.Y.S.2d 437, 438 (App. Div. 1980). In that case, the plaintiff sued in federal court under § 1983, claiming that he suffered damages from the deprivation of his Fourth Amendment rights. According to the plaintiff's complaint, he suffered both physical and mental injuries, nervous shock and humiliation, and harm to his reputation and business. *Id.* at 439. As a result of that action, he recovered compensatory and punitive damages against the defendants. *Id.*

The plaintiff later commenced a state court action, alleging, among other things, that he suffered damages for false arrest, intentional infliction of mental and physical injury, and intentional in-

fliction of mental distress. *Id.* The defendants challenged the state court action, asserting that res judicata principles and the rule against double recovery should shelter them from further attack under common law tort theories. *Id.* at 440. In agreeing with the defendants on the double recovery theory, the New York court explained that because the plaintiff had already recovered adequate damages in his § 1983 action on the same facts constituting the injury underlying the common law tort action for false arrest, intentional infliction of mental distress, and mental and physical injury, "in justice and fairness, no further recovery should be allowed." *Id.* at 444.

While preclusion principles are not a bar to Grosjean's state law claims here, the prohibition against double recovery for a single injury operates to foreclose any further recovery against Imperial Palace. His tort claims and his § 1983 claims are alternative theories for recovering damages resulting from the Imperial Palace security guards' actions of detaining and searching him. *See Zarcone*, 434 N.Y.S.2d at 441 (noting that the plaintiff's causes of action for, among other things, false arrest and intentional infliction of emotional and physical harm, required "virtually the same proof, both as to the prima facie elements and damages, which a cause of action under section 1983 comprehends"); *compare Marschall v. City of Carson*, 86 Nev. 107, 110, 464 P.2d 494, 497 (1970) (noting that to establish false imprisonment, a plaintiff must prove that he was "restrained of his liberty under the probable imminence of force without any legal cause or justification therefore"), *with Camara v. Municipal Court*, 387 U.S. 523, 528 (1967) (explaining that the Fourth Amendment's purpose is to "safeguard the privacy and security of individuals against arbitrary invasions by governmental officials"). Although a plaintiff may assert both a § 1983 claim and tort-based claims, he or she is not entitled to a separate compensatory damage award under each legal theory. *See Clappier v. Flynn*, 605 F.2d 519, 529 (10th Cir. 1979); *Zarcone*, 434 N.Y.S.2d at 444. Instead, if liability is found, the plaintiff is entitled to only one compensatory damage award on one or both theories of liability. *Clappier*, 605 F.2d at 529 (concluding that the district court erred in awarding judgment under both negligence and deprivation of civil rights theories of liability on the claims because the interest protected by the common law of negligence, as applied to the facts, closely paralleled the interest protected by the constitutional amendment on which the plaintiff was relying, such that the relief afforded under the common law of torts and § 1983 were identical); *Woodward & Lothrop v. Hillary*, 598 A.2d 1142, 1148 (D.C. 1991) (explaining that in cases grounded on both § 1983 and tort liability the-

ories, the jury must be explicitly instructed that the plaintiff may be compensated only for damages that fairly compensate for actual injuries in the aggregate).

As for punitive damages, NRS 42.005 limits recovery based on the amount of compensatory damages awarded. Accordingly, regardless of whether the district court properly dismissed Grosjean's state law claims against Imperial Palace on discretionary-function immunity grounds, because he succeeded on his § 1983 claim, the double recovery rule precludes him from now proceeding on the state law claims. Therefore, we do not further address the district court's decision to dismiss those claims.

## CONCLUSION

First, addressing Imperial Palace's and Espensen's arguments on cross-appeal that reversal is warranted because they are entitled to qualified immunity for any § 1983 liability, on the disputed facts and for policy reasons, we conclude that qualified immunity does not apply to protect Imperial Palace and Espensen from liability in this matter. Next, although Imperial Palace and Espensen assert that they are entitled to a new trial based on certain evidentiary rulings, we perceive no abuse of discretion in the way in which the court managed the trial and testimony. Further, with regard to the liability and compensatory damages phase of the trial, the misconduct on behalf of Grosjean's attorney properly was addressed by the district court on those occasions when Imperial Palace objected, and any unobjected-to comments did not rise to the irreparable and fundamental error level warranting a new trial as to liability and compensatory damages. Thus, the district court acted within its discretion by denying Imperial Palace's motions for judgment notwithstanding the verdict and new trial in that regard.

Next, addressing the punitive damages award, because the NRS 42.005 standard for awarding punitive damages comports with federal guidelines for determining whether punitive damages are available in § 1983 actions, punitive damages properly were presented to the jury, and the district court therefore properly denied Imperial Palace's motion for a directed verdict. Since, however, the nature and extent of Grosjean's attorney's misconduct during the punitive damages phase of the trial was egregious and could not have been cured by a sustained objection, and the jury's verdict appeared controlled by the misconduct rather than the evidence, a new trial is warranted as to punitive damages.

Finally, with regard to Grosjean's dismissed state law claims against Imperial Palace, because he already recovered from Imperial Palace on his § 1983 claim on the same facts that would give rise to any injury allowing him to recover damages on his state law claims,

he is foreclosed from further pursuing damages for that injury. Thus, Grosjean cannot now reinstate his state law claims against Imperial Palace.

Accordingly, we affirm the district court's NRCP 54(b) certified judgment as to Imperial Palace and Espensen with respect to compensatory damages, reverse the judgment as to punitive damages, and remand this matter to the district court for a new trial as to the punitive damages.

HARDESTY, C.J., CHERRY, SAITTA, GIBBONS, and PICKERING, JJ., concur.