131 Nev., Advance Opinion 81
IN THE COURT OF APPEALS OF THE STATE OF NEVADA

EMMETT J. MICHAELS,
Appellant,
vs.
PENTAIR WATER POOL AND SPA,
INC., A DELAWARE CORPORATION,
Respondent.

No. 59685

FILED

OCT 01 2015

TRACIE K. LINDEMAN
CLERK OF SUPREME COURT
BY_____
CHIEF DEPUTY CLERK

Appeal from a final district court order in a products liability action. Eighth Judicial District Court, Clark County; Douglas W. Herndon, Judge.

*Vacated and remanded.*

Winner & Carson, P.C., and Robert A. Winner and Brent A. Carson, Las Vegas,
for Appellant.

Lewis Roca Rothgerber LLP and Daniel F. Polsenberg and Joel D. Henriod, Las Vegas; Buchalter Nemer and George J. Stephan, Los Angeles, California,
for Respondent.

BEFORE GIBBONS, C.J., TAO and SILVER, JJ.

*OPINION*

By the Court, TAO, J.:

The instant appeal arises from allegations of attorney misconduct in a products liability trial involving swimming pool filters.

COURT OF APPEALS
OF
NEVADA

(O) 1947B

2/8/16: Corrected per letter to publishers. GT

15 - 901192

After the jury rendered a verdict in favor of the manufacturer, the plaintiff filed a post-trial motion seeking a new trial based upon alleged misconduct committed by the manufacturer's attorney. The district court denied the motion, but failed to make the detailed findings required by the Nevada Supreme Court.

The Nevada Supreme Court recently issued two opinions clarifying how claims of attorney misconduct must be handled both by the district court and subsequently on appeal. In this opinion, we take the opportunity to summarize those recent developments and to provide guidance to district courts tasked with resolving claims of misconduct. Because the district court in this case failed to make detailed findings regarding the alleged misconduct that might have enabled us to determine whether those cases would have affected its decision, we must remand the case to the district court to reconsider its decision in light of those cases and to make the necessary findings. To assist the district court, we identify some factors that must be considered on remand.

*FACTS*

Respondent Pentair Water Pool and Spa, Inc. (Pentair), manufactures various models of swimming pool filters for both commercial and residential swimming pools, including the Nautilus FNS filter. In 2006, appellant Emmett Michaels purchased a Nautilus FNS filter for use in his backyard swimming pool. Michaels had owned his swimming pool for 27 years, and when his previous filter canister malfunctioned, he integrated the FNS canister into his preexisting filter system. Like many other homeowners, Michaels connected his pool filter system to an automatic timer that could be programmed to turn the system off at night

and on again during the day.[1] On July 1, 2008, the filter system was turned off but Michaels manually turned it on in anticipation of guests arriving. The FNS filter canister exploded, and pieces struck Michaels in the left eye and ruptured his eyeball, which had to be removed and replaced with a prosthesis.[2] Thereafter, Michaels initiated the underlying action and sought damages based on his injuries. While Michaels asserted several claims for relief, only the products liability claim is the subject of the instant appeal.

Michaels alleged that the design of the FNS filter was legally defective because it lacked either (1) a redundant or secondary restraint to hold the canister together in the event of an explosive failure of the clamp; or (2) an external, automatic air release valve allowing any compressed air trapped within the canister to be released if pressure reached dangerous levels. Michaels also alleged that Pentair failed to give him proper warnings regarding the risk of explosion.

Following a two-week trial, the jury returned a verdict in favor of Pentair on all claims. Michaels filed a post-trial motion for judgment as a matter of law or, alternatively, for a new trial, which was denied by the district court. Michaels now appeals from the denial of that motion.

---

[1]During the trial, witness testimony was presented that "almost all" homeowners connect their filter systems to automatic timers, an assertion that was not disputed by Pentair.

[2]While, as discussed below, some of the precise circumstances surrounding Michaels' eye injury were disputed below and are again disputed on appeal, that the filter canister exploded and that the explosion was the proximate cause of the injury to Michaels' eye appears to be undisputed.

*The operation of swimming pool filters*

In order to properly understand the evidence and the arguments made by the parties, a brief explanation of the operation of swimming pool filters is appropriate. The Nautilus FNS filter is a so-called split-shell design consisting of two pieces held together by a steel clamp to form a cylinder in which removable filter grids are placed. In operation, water is pumped from the pool and forced under pressure through the filter grids, which trap debris and remove it from the pool water. The steel clamp that holds the two cylinder pieces together can be removed so that the canister may be separated and the filter grids periodically cleaned or replaced.

Pool filter systems are designed as either open systems, in which a water pump pushes pool water through the filter, or closed systems, in which a water pump suctions water through the filter. In either system, a system of pipes carries water from the pool through the filter canister and then back to the pool. The flow of water through the system may be directed by a series of valves mounted on the pipes.

After a filter has been in operation for some time, debris from the pool can accumulate on the filter grids and eventually may clog the flow of water through the system, impeding the effectiveness of the system. To allow removal of some of the debris, some users manipulate the valves to reverse the flow of water through the filter grids and into a separation tank that collects the debris, in a process colloquially known as backwashing. Pentair discourages backwashing and its engineers consider it unsafe, but during trial its expert conceded that manufacturers were aware that users frequently backwashed filters and that such backwashing was foreseeable. In any event, after the filter grids have been backwashed, the valves can be switched back to their normal

Court of Appeals
of
Nevada

(O) 1947B

4

operating positions. Even with regular backwashing, however, the filter grid elements can eventually become so clogged with detritus that they may sometimes have to be removed and replaced entirely, which is why split-shell filter canisters such as the Nautilus FNS are designed with clamps allowing the canister to be opened.

So long as the filter system is operating normally, water continually moves through the filter cartridge and the water pressure within the filter canister remains more or less constant. However, the pressure within the system may vary from its normal operating levels under two conditions. First, if a large quantity of debris has collected on the filter grids and clogged the system, a water pressure differential may be created within the system as water is pumped into the filter canister under pressure but only trickles out through the clogged grids. This is not normally considered a dangerous occurrence, because water (unlike air) cannot be easily compressed and most filter systems can safely contain water pressure differentials without difficulty, although the ability of those systems to clean the water may become compromised.

Far more relevant to the instant case is the second condition, which may occur when the filtration system is turned completely off, causing the water to stop flowing and potentially permitting air to bleed into the system. In commercial pool systems, this condition rarely occurs because most commercial pools are left on continuously, except perhaps occasionally when being actively serviced. On the other hand, many residential pool systems are regularly turned on and off by homeowners (usually at night or during the winter months when the pool is rarely used) in order to save electricity. Indeed, testimony was presented that the majority of residential pool owners connect their pool filter systems to

(O) 1947B

timers that automatically turn the system off at night and back on during the day.

When the system is turned off and then turned back on, air that bled into the system while it was off is pushed into the canister by the flow of water. If the filter grids are clogged, the air may become trapped within the canister against the clog with nowhere to go. As more air and water continue to be pumped into the canister under pressure, air pressure may build up within the canister, creating a condition known in the industry as a dead-head. If the pressurized air cannot find a way to escape, the air pressure within the canister grows to dangerous levels as more air and water are forced into the system. When the air pressure within the canister exceeds the ability of the metal clamp to hold the canister together, the canister may explode.[3]

To reduce the risk of such explosive dead-heads, the instruction manual accompanying the FNS filter "recommends" that the consumer manually bleed excess air from the system each and every time the system is turned off and on. However, when a pool filter is connected to a timer that automatically turns the system off at night and on during the day with no action by the homeowner, the recommendations contained in the instruction manual cannot be complied with, because an automated timer system will not manually bleed out air every time the filter is cycled back on.

---

[3]Some filter canisters are sold as single piece or single tank canisters that cannot be opened, and the filter grids in those types of canisters cannot be replaced or removed for cleaning. Based upon testimony at trial, no explosions of single piece canisters are known to have occurred.

*The evidence and arguments at trial*

Michaels contended that the known risks of explosion rendered the design of the Nautilus FNS filter inherently unsafe when used in normal operation. Pentair countered that the explosion in this case was caused not by any inherent flaw in the design of the system, but rather by an explosive dead-head created by Michaels himself through improper and unforeseeable misuse of the FNS canister. Specifically, Pentair averred that Michaels improperly installed the FNS filter canister onto an obsolete 27-year-old pool filter system that was never designed for the FNS canister and contained a device known as a positive shut-off valve that could be misused in a way that increased the risk of dead-heads and explosions.

In support of his theory, Michaels presented the testimony of Dr. John Manning, an expert in mechanical engineering, as well as Dr. Alison Osinski, an aquatics expert. Both generally testified that the phenomenon of pool filters exploding under pressure was known in the industry, that the design of the FNS filter was unsafe, and that safer alternatives existed, including models sold by Pentair that possessed automatic external pressure-relief valves and redundant restraints. Osinski testified that six different companies offered split-shell filter canisters for sale that had redundant restraints and automatic external pressure relief valves, and that explosions of split-shell filters having such safety features were virtually unknown. In contrast, Osinski noted that more than 50 such explosions were known to have occurred with split-shell filters sold without such features, many of which had caused serious trauma and even death to homeowners. The experts noted that Pentair sold a Sta-Rite System 3 split-shell filter with secondary restraints that Pentair advertised as "the world's safest and easiest to operate filter." The

COURT OF APPEALS
OF
NEVADA

(O) 1947B

jury saw internal correspondence written by Pentair employees dated May 16, 1993, which recognized the danger of filter separation under pressure and noted that consumers could be expected to misuse split-shell pool filters in a way that could increase the risk of explosion.

Testimony from several of Pentair's employees confirmed key portions of Michaels' allegations. For example, Pentair's chief engineer, Ron Robol, testified that he believed the design of the FNS filter was safe. However, he agreed that the phenomenon of explosive dead-heads was known within the industry, and admitted that at various times Pentair had sold split-shell filter canisters equipped with automatic external pressure-relief valves designed to reduce the risk of explosion. He conceded that when Pentair sold split-shell canisters with automatic external air relief valves in the past, those valves worked fine. He also agreed that, between 1998 and 2008, Pentair received no claims of filter explosions relating to split-shell canisters sold with such automatic valves, but had received more than 50 reports of explosions in split-shell models sold without those valves.[4] Robol also admitted that filter canisters were designed to be cleaned by consumers, and the accidental creation of dead-heads, either through improper consumer cleaning, or simply because the system was turned on and off repeatedly, was "foreseeable" to manufacturers such as Pentair.

---

[4]The parties vigorously dispute the number of prior explosions in their appellate briefing. Michaels contends that 50 explosions were known to have occurred in filter canisters of split-shell design similar to the FNS canister. On the other hand, Pentair argues that only 4 prior explosions were known to have occurred with the FNS canister itself.

 

Similarly, Pentair's product manager of filtration, Robert Swindell, agreed through his deposition testimony that a consumer's failure to install the canister properly, to clamp it shut, and to release air pressure before or during cleaning were all "foreseeable" events. He acknowledged that Pentair's Sta-Rite 3 filtration system was safer than the FNS because it was held shut by eight individual clamps rather than a single clamp. Additionally, Pentair's Vice-President of Engineering, Garrett Burkitt, conceded at his deposition that Pentair was aware of claims of pool filter separations with its FNS canister, while Pentair employee Robert Wilkes admitted that safer alternatives to steel clamps existed, including a threaded screw-type ring lock system for which no known instances of explosive filter separation had ever been reported.[5]

Pentair's defense focused upon the contention that the FNS filter canister was safe, partly because the explosion in this case was caused not by any inherent defect in the design of the FNS filter canister, but rather by Michaels' own unforeseeable, negligent, and dishonest actions. Specifically, Pentair contended that Michaels caused the explosion by dead-heading the system while improperly backwashing it, and then lied about how the explosion occurred. Pentair suggested that Michaels improperly grafted the FNS filter canister onto an older filter system that contained a positive shut-off valve that, when incorrectly used, would seal the canister and trap air within it, thereby artificially

---

[5]Pentair also proffered lay witness testimony from Russell Cannon, a plumber who knew of no explosion incidents with the FNS canister filter during his many years servicing those filters, and from Darren Gagnon, a pool filter installer, who testified that he had installed the FNS filter for decades, knew of no explosions, and considered it a safe product.

creating a dead-head when one otherwise would not have naturally occurred.

During trial, no witness called by either party affirmatively testified that Michaels had improperly used the positive shut-off valve to create an artificial dead-head within the system. Michaels explicitly denied doing so, and no witness identified any evidence suggesting such misuse. Instead, Pentair's implication that such misuse may have occurred rested upon two prongs. First, after the explosion but before trial, Michaels negligently disposed of parts of his pool filtration system, including the separation tank, the selector valve attached to the filter, the shut-off valves, and various pipes and plumbing. During the trial, Pentair requested, and the district court gave, an instruction that permitted the jury to make an inference adverse to Michaels based upon the failure to preserve the filter system for discovery and trial.[6] Pentair thus argued to the jury that, had the entire filter system been made available for inspection, evidence might have been uncovered that indicated Michaels seriously misused the system while backwashing it.

Second, Pentair made Michaels' credibility a major subject of the trial. Michaels testified that the canister exploded spontaneously when he merely turned the pool filter system on while standing a few feet

---

[6]The instruction given by the district court was as follows:

> Twelve: Where relevant evidence which would properly be part of this litigation is within the control of the plaintiffs whose interest it would be to produce it, and they failed to do so without a satisfactory explanation, the jury may draw an inference that such evidence would have been unfavorable to the plaintiffs.

COURT OF APPEALS
OF
NEVAOA

(O) 1947B

away from the system. However, Pentair introduced photos of objects lying on the grass near the canister which, Pentair argued, suggested Michaels was conducting some kind of maintenance on the filter when it exploded. While this contention was disputed by Michaels, medical records indicated that Michaels admitted to his physician that he had been servicing the filter when it exploded. Michaels also testified during trial that he never cleaned the filter himself during the two years he owned it, and that he thought the filter was being cleaned by his maintenance company, Pool Chlor. However, the owner of Pool Chlor testified that the company only managed the chemical levels in the pool and never cleaned Michaels' pool filter.

On cross-examination by Pentair, Michaels' experts agreed that their conclusion that Michaels' injury was caused by the defective design of the FNS filter was predicated upon Michaels' own description of how the explosion occurred, and if Michaels was proven to have lied, then their conclusions may no longer be valid. Pentair also argued that certain facts proven by Michaels' experts, while true, could be interpreted in different ways. For example, Pentair's statistical expert, Dr. Laurentius Marais, testified that while Pentair had received 50 reports of explosions in filter canisters lacking redundant safety features, those 50 claims must be considered in the context of the thousands of canisters sold nationally.

Thus, in lieu of evidence affirmatively demonstrating that Michaels had modified or misused the FNS filter canister in an unforeseeable way to cause the explosion, Pentair argued that inconsistencies in Michaels' evidence, coupled with the negligent disposal of parts of the filter system prior to trial, permitted the jury to infer that such a modification or misuse had occurred. Consequently, Pentair

argued to the jury that Michaels failed to meet his burden of demonstrating by a preponderance of the evidence either that the design of the FNS filter was unsafe or that any design defect was the proximate cause of his injury.

## ANALYSIS

On appeal, Michaels asserts various errors. However, because the trial court failed to properly analyze the claims of attorney misconduct made by Michaels in his post-trial motions under the standard set forth in *Lioce v. Cohen*, 124 Nev. 1, 174 P.3d 970 (2008), we need only address that contention.

When the losing party in a civil trial alleges in a post-trial motion that it is entitled to a new trial because the prevailing party committed attorney misconduct during the trial, the Nevada Supreme Court has held that the district court must make detailed findings regarding the role that the alleged misconduct played at trial and the effect it likely had on the jury's verdict. *Id.* at 20, 174 P.3d at 982. *See BMW v. Roth*, 127 Nev. 122, 141 n.9, 252 P.3d 649, 661 n.9 (2011) (appellate consideration of alleged attorney misconduct that was not the subject of specific district court findings "would be contrary to *Lioce*'s requirement of specific oral and written findings of misconduct to facilitate appellate review of orders granting or denying new trials based on attorney misconduct"). In this case, the district court did not make those findings. The portion of the district court's written order denying Michaels' request for relief due to attorney misconduct simply states that "[i]n considering plaintiff's allegations under *Lioce v. Cohen* . . . this Court does not find grounds warranting a new trial." The district court's written order contains no other findings relating to Michaels' claims of attorney misconduct.

Ordinarily, we could simply order a limited remand of this matter so that the district court can make the required findings. However, in reviewing the precedent of the Nevada Supreme Court, some of which is quite recent, we take this opportunity to provide guidance to the district court on the kinds of findings that must be made. Because the district court did not apply the reasoning of these more recent cases, and because *Lioce* itself does not set forth a specific list of what the district court's findings must include, we remand this matter to the district court to reconsider its conclusions in view of recent precedent and to make the findings necessary to support its ultimate decision.

*Standard of review*

A district court's decision to grant or deny a motion for a new trial is reviewed for an abuse of discretion.[7] *Lioce*, 124 Nev. at 20, 174 P.3d at 982. In determining whether such an abuse of discretion occurred,

_____

[7]Michaels' district court motion also requested, in the alternative, judgment as a matter of law on various grounds. While the denial of a post-judgment motion for judgment as a matter of law is not independently appealable, *see Skender v. Brunsonbuilt Constr. & Dev. Co.*, 122 Nev. 1430, 1434 n.4, 148 P.3d 710, 713 n.4 (2006), in this case the order denying that motion and Michaels' motion for a new trial were entered prior to the final judgment in the underlying case. As a result, the order denying Michaels' motion for judgment as a matter of law is an interlocutory order, which we can review in the context of Michaels' appeal from the final judgment. *See Consol. Generator-Nev., Inc. v. Cummins Engine Co.*, 114 Nev. 1304, 1312, 971 P.2d 1251, 1256 (1998) (recognizing that interlocutory orders entered before final judgment can be reviewed in an appeal from the final judgment). However, for reasons discussed herein, we limit the scope of this opinion only to the question of attorney misconduct. Because attorney misconduct cannot be the basis for entry of judgment as a matter of law, in this opinion we address only Michaels' request for a new trial.

this court must view the evidence and all inferences most favorably to the party against whom the motion is made. *Grosjean v. Imperial Palace, Inc.,* 125 Nev. 349, 366, 212 P.3d 1068, 1080 (2009).

An attorney may not "encourage[ ] the jurors to look beyond the law and the relevant facts in deciding the case before them." *Lioce,* 124 Nev. at 6, 174 P.3d at 973. "Under NRCP 59(a)(2), the district court may grant a new trial if the prevailing party committed misconduct that affected the aggrieved party's substantial rights." *Gunderson v. D.R. Horton, Inc.,* 130 Nev. ___, ___, 319 P.3d 606, 611 (2014).

In *Lioce,* the Nevada Supreme Court articulated the applicable legal standards governing appellate review of a district court's denial of a motion for a new trial based on alleged attorney misconduct. *See Lioce,* 124 Nev. at 14-26, 174 P.3d at 978-86. *Lioce* required the district court to make post-trial findings on the effect of the misconduct upon the trial, but did not delineate the kinds of findings that are required. *Id.* In two recent cases, *Gunderson v. D.R. Horton, Inc.,* 130 Nev. ___, 319 P.3d 606 (2014), and *BMW v. Roth,* 127 Nev. 122, 252 P.3d 649 (2011), the Nevada Supreme Court expanded upon its *Lioce* analysis and further explained how the district court, and appellate courts, should evaluate claims of misconduct. The district court in this case did not apply these new cases when it decided Michaels' motion, and so we take this opportunity to clarify the standard that must be followed in view of those cases.

Determining whether a new trial is warranted involves the application of a three-step analysis. First, we must determine whether misconduct occurred. *Gunderson,* 130 Nev. at ___, 319 P.3d at 611. Whether an attorney's comments constitute misconduct is a question of law reviewed on appeal de novo. *BMW,* 127 Nev. at 132, 252 P.3d at 656.

If such misconduct has occurred, the next step is to determine the proper legal standard to apply in assessing whether the misconduct warrants a new trial. *Gunderson*, 130 Nev. at ___, 319 P.3d at 611. Finally, we must determine whether the district court abused its discretion in applying that standard. *Id.*

When a party claims misconduct by opposing counsel, the legal standard under which that misconduct is reviewed depends on whether a timely trial objection was made. *See Lioce*, 124 Nev. at 17-19, 174 P.3d at 980-82. When a timely objection was not made at trial, any review of that misconduct, either post-trial by the trial court or on appeal, is considerably more circumscribed than if an objection was made. When resolving a motion for a new trial based on unobjected-to attorney misconduct, "the district court shall first conclude that the failure to object is critical and the district court must treat the attorney misconduct issue as having been waived, unless plain error exists." *Id.* at 19, 174 P.3d at 982. To decide whether there is plain error, the district court must then determine "whether the complaining party met its burden of demonstrating that its case is a rare circumstance in which the attorney misconduct amounted to irreparable and fundamental error." *Id.* And "[i]n the context of unobjected-to attorney misconduct, irreparable and fundamental error is error that results in a substantial impairment of justice or denial of fundamental rights such that, but for the misconduct, the verdict would have been different." *Id.* Thus, in this case, because no objection was lodged at trial, a new trial would only be warranted if Pentair committed misconduct and the misconduct amounted to "plain error."

Plain error requires a party to show "'that no other reasonable explanation for the verdict exists.'" *Id.* (quoting *Ringle v. Bruton*, 120 Nev. 82, 96, 86 P.3d 1032, 1041 (2004)). Analyzing whether such plain error has occurred involves weighing the misconduct against the reasonableness of the jury's verdict in light of the evidence in the record. *Gunderson*, 130 Nev. at \_\_\_, 319 P.3d at 614 ("In evaluating [the effect of misconduct on a verdict], we 'look at the scope, nature, and quantity of misconduct as indicators of the verdict's reliability'" (quoting *Grosjean*, 125 Nev. at 365, 212 P.3d at 1079)). Moreover, the court must consider the "context" in which the misconduct occurred. *Id.*

Necessarily, then, a determination of whether unobjected-to misconduct has created plain error requires balancing the severity of the misconduct against the weight of the evidence supporting the jury's verdict. In doing so, however, we must bear in mind that "credibility determinations and the weighing of evidence are left to the trier of fact." *See Grosjean*, 125 Nev. at 366, 212 P.3d at 1080. Where the record demonstrates that the jury's verdict is strongly supported by overwhelming evidence, the verdict can generally be explained by the evidence itself and even serious misconduct may not warrant a new trial. On the other hand, where the evidence in the record is insufficient to reasonably explain the jury's verdict even when viewed in the light most favorable to the prevailing party, or if it does so only very weakly or implausibly, then trial misconduct is likely to have resulted in fundamental error, because in those circumstances the jury's verdict was more likely to have been a product of the misconduct rather than of a fair consideration of the evidence presented. *Id.* at 364, 212 P.3d at 1079 (attorney misconduct warrants new trial in "the rare occasion when the

attorney misconduct 'offsets the evidence adduced at trial in support of the verdict'" (quoting *Lioce*, 124 Nev. at 19, 174 P.3d at 982)).

Furthermore, the court must consider the "context" of the misconduct. *Gunderson*, 130 Nev. at ___, 319 P.3d at 614. Misconduct that was largely collateral to the principal issues in dispute is less likely to have resulted in plain error than misconduct that touched directly upon the central questions the jury was asked to resolve. By way of hypothetical example, Nevada Rule of Professional Conduct (RPC) 3.4(e) prohibits an attorney from stating "a personal opinion as to . . . the credibility of a witness." *See Lioce*, 124 Nev. at 21-22, 174 P.3d at 983 ("[A]n attorney's statements of personal opinion as to the justness of a cause, the credibility of a witness, or the culpability of a litigant is . . . improper in civil cases and may amount to prejudicial misconduct necessitating a new trial."). When an attorney improperly vouches for the credibility of an inconsequential witness whose testimony related to a collateral issue and whose credibility was never attacked by the opposing party, such misconduct likely played a lesser role in the jury's verdict than if the attorney vouched for a witness whose credibility was directly challenged and whose truthfulness regarding a key issue was the principal or sole question for the jury's consideration. Similarly, vouching for the credibility of a witness whose testimony was largely cumulative to other evidence or irrelevant to the main issues in genuine dispute is less likely, in context, to warrant a new trial than if the witness's testimony were the only evidence supporting a key contention.

Finally, the frequency of the misconduct must be considered. A single, isolated instance of misconduct is likely to have had a lesser impact on the trial than repeated or persistent instances of misconduct.

*See Gunderson*, 130 Nev. at ___, 319 P.3d at 612 ("[T]he district court must take into account that, by engaging in continued misconduct, the offending attorney has accepted the risk that the jury will be influenced by his misconduct. . . . although specific instances of misconduct alone might have been curable by objection and admonishment, the effect of persistent or repeated misconduct might be incurable." (internal quotation omitted)).

Thus, determining whether "plain error" has occurred as a result of unobjected-to misconduct requires the court to closely examine the record, weigh the severity and persistence of the misconduct against the evidence presented, and assess what role, if any, the misconduct likely played in the jury's verdict. *See BMW*, 127 Nev. at 133, 252 P.3d at 656-57.

*Overview of products liability law*

Because alleged attorney misconduct must be evaluated in "context," a brief examination of the substantive law that governed the trial is necessary. On appeal, the only claim remaining before us is the products liability claim, which is a strict liability claim. In Nevada, a manufacturer or distributor of a product is strictly liable for injuries resulting from a defect in the product that was present when the product left its hands. *Allison v. Merck & Co., Inc.*, 110 Nev. 762, 767, 878 P.2d 948, 952 (1994). "[P]roducts are defective which are dangerous because they fail to perform in the manner reasonably to be expected in light of their nature and intended function." *Ginnis v. Mapes Hotel Corp.*, 86 Nev. 408, 413, 470 P.2d 135, 138 (1970) (internal quotations omitted). "Reasonableness" may be determined with reference to such things as whether a safer design was possible or feasible, whether safer alternatives are commercially available, and other factors. *See McCourt v. J.C. Penney Co., Inc.*, 103 Nev. 101, 104, 734 P.2d 696, 698 (1987) (stating that

"[a]lternative design is one factor for the jury to consider when evaluating whether a product is unreasonably dangerous").

Furthermore, manufacturers are not necessarily liable for injuries caused by a product that was substantially modified or misused by the consumer or by an intermediary. "Generally, a substantial alteration will shield a manufacturer from liability for injury that results from that alteration," but a product manufacturer remains liable if the alteration was insubstantial, foreseeable, or did not actually cause the injury.[8] *Robinson v. G.G.C., Inc.*, 107 Nev. 135, 140, 808 P.2d 522, 525 (1991).

When the risk of danger associated with a product is such that it cannot be corrected or mitigated by a commercially feasible change in the product's design available at the time the product was placed in the stream of commerce, the manufacturer must give adequate warning to consumers of the potential danger. *See id.* at 138, 808 P.2d at 524. Where a plaintiff alleges that such warnings were not adequately given, the "plaintiff carries the burden of proving, in part, that the inadequate warning caused his injuries." *Rivera v. Phillip Morris, Inc.*, 125 Nev. 185, 190, 209 P.3d 271, 274 (2009).

---

[8]Because products liability claims allege strict liability, comparative negligence is not a defense to a prima facie case of such liability. *Maduike v. Agency Rent-a-Car*, 114 Nev. 1, 7, 953 P.2d 24, 27 (1998) ("[C]omparative negligence reductions do not apply when the claim is based on strict liability."). Comparative fault is, however, a defense to a negligence claim. Thus, even though the only claim on appeal before us is the strict liability cause of action, evidence of comparative fault was admitted and argued at trial in connection with Michaels' negligence claim.

*Michaels' assertions of attorney misconduct*

Michaels argues that, during closing argument, Pentair's counsel made various impermissible statements that were not based in evidence or that reflected the personal opinion of counsel. Michaels' counsel did not timely object to any of the statements now cited as error on appeal.

In *Lioce*, the Nevada Supreme Court directed district courts confronted with post-trial motions alleging attorney misconduct as follows:

> [W]e now require that, when deciding a motion for a new trial, the district court must make specific findings, both on the record during oral proceedings and in its order, with regard to its application of the standards described above to the facts of the cases before it. In doing so, the court enables our review of its exercise of discretion in denying or granting a motion for a new trial.

124 Nev. at 19-20, 174 P.3d at 982. *See also BMW*, 127 Nev. at 141 n.9, 252 P.3d at 661 n.9.

Conceivably, in some cases in which a district court fails to make requisite findings in support of a decision, that decision may nonetheless be affirmed on appeal if the record as a whole demonstrates that the ultimate conclusion was correct even if the reasons for it are not clearly articulated. For example, if the most cursory review of the briefs or the record clearly demonstrates that no misconduct occurred as a matter of law, then a remand for the district court to simply state the obvious would seem wasteful and unnecessary. During oral argument, Pentair's counsel suggested that a remand in this case was unnecessary for precisely this reason. Had our review of the record in this case clearly indicated either that no misconduct occurred, or that any attorney misconduct that occurred could not possibly have affected the jury's

verdict, then we could perhaps resolve this appeal based upon the record alone without the need for additional findings by the district court.

In this case, however, the record reveals that Pentair's attorney made a variety of statements during closing argument that could plausibly constitute the kind of attorney misconduct that concerned the Nevada Supreme Court in *Lioce*.[9] For example, Pentair's counsel appeared to vouch for a witness, Dr. Casey (Michaels' treating physician who contradicted Michaels' version of events), by stating that "I think he is a credible and honest witness." Counsel also appeared to offer opinions about other witnesses, including witnesses from Pool Chlor, stating "I don't know about you, but I know what I thought about those people's testimony."[10] By offering personal opinions about the credibility of

---

[9]In *Lioce*, the Nevada Supreme Court conducted a detailed analysis of the scope and severity of the alleged misconduct before concluding that a remand for additional findings was necessary; indeed, the supreme court went so far as to conclude that misconduct occurred as a matter of law before remanding. 124 Nev. at 20-25, 174 P.3d at 982-85. In this opinion, we are not required to go that far.

[10]Counsel's closing argument contains other injections of personal opinion, such as: "Why is Mr. Michaels . . . saying that he is looking away from the plate? Why is he saying that? . . . I'll give you what I think the answer is."; "I don't think that is the physical evidence. I don't think the physical evidence supports that."; "I have an explanation for you—for your consideration as to what I think is consistent with the physical evidence in this case. I think the lid did separate up. . . . I think what was happening was Mr. Michaels just cleaned and back washed and cleaned the filter that day. . . . So I think that what happened is he cleaned it."; "I don't think Sunrise Hospital Medical Center is going to do that."; "I really think we all know what really happened." Counsel even proffered his own personal medical diagnosis of the severity of Michaels' injuries and how they were incurred, arguing that "if he fell straight down on concrete, you think his head would be swollen. I do."

witnesses, Pentair's counsel may have violated RPC 3.4(e), which states that, during the course of a trial, an attorney shall not state "a personal opinion as to . . . the credibility of a witness." *See Lioce*, 124 Nev. at 21-22, 174 P.3d at 983 ("[A]n attorney's statements of personal opinion as to the justness of a cause, the credibility of a witness, or the culpability of a litigant is . . . improper in civil cases and may amount to prejudicial misconduct necessitating a new trial."). The district court's written order fails to indicate whether the court fully considered these arguments, whether it concluded that they did not constitute misconduct, or whether it instead concluded that they represented misconduct but that no fundamental error occurred.[11]

Another instance of potential misconduct appeared to occur in relation to the adverse inference jury instruction given by the trial court. An adverse inference instruction may be given when a district court concludes that particular evidence was negligently destroyed. *Franchise Tax Bd. of Cal. v. Hyatt*, 130 Nev. ___, ___, 335 P.3d 125, 152 (2014), *cert.*

---

[11]We note that this was a two-week jury trial and the trial transcript appears not to have been available to the district court when it considered Michaels' motion, and therefore we acknowledge that it may well be easier for us to scour the record and locate these statements now than it was for the district court when the motion was first presented. We also note that official transcripts of the trial may not be available when a district court is confronted with post-trial motions alleging attorney misconduct, because the deadline for filing a motion for new trial expires ten days after entry of judgment, NRCP 59, and in longer trials the full transcript may not be available until well after that time period has elapsed. Thus, in many cases it may be difficult for the parties to fully cite to specific instances of misconduct in their post-trial briefing and for the district court to make precise findings, especially when the precise wording of an attorney's argument is disputed.

COURT OF APPEALS
OF
NEVADA

(O) 1947B

*granted in part*, 576 U.S. ___, 135 S. Ct. 2940 (2015). The adverse inference instruction "merely allows the fact-finder to determine, based on other evidence, that a fact exists." *Id.* The adverse inference instruction in this case (jury instruction number 12) was given by the court as a sanction for very specific conduct, namely, Michaels' negligent disposal of pieces of the filter system before trial. But during closing argument, Pentair's counsel appeared to invite the jury to apply this instruction to other evidence that had no relation either to the discovery violation, the district court's sanction, or the purpose of the instruction given by the court. Specifically, Pentair's counsel argued that the adverse inference instruction applied to a plumbing expert that Michaels purportedly retained. Counsel argued:

> There is another expert they didn't bring in, where you could think that maybe that expert wasn't going to say good things. Who did the plaintiffs call, the plaintiff's lawyer, right after the accident to come and take [pictures]. I don't remember the gentleman's name, but he was a plumbing expert. That much I remember. Remember Mr. Kesky. I played his deposition. . . . He said [that he] discussed the plumbing issues with the expert. But did the plaintiffs bring him in here. . . . Is there a reason for that. I remind you of the instruction, where the plaintiffs have the evidence, because they are the only ones in control of that expert, he was the one that has his investigator there, not us, Pentair had no chance at any of this, you take it against [Michaels].

However, the record does not appear to indicate that any such plumbing expert was ever retained by Michaels; the district court did not make any findings on this question. Furthermore, even if a plumbing expert had been retained, counsel's invitation for the jury to apply the adverse inference instruction to Michaels' failure to call that witness is

problematic because the adverse inference instruction was not given as a sanction for that conduct.[12]

Consequently, we cannot conclude from the record that attorney misconduct was so clearly absent from the trial that additional findings by the district court would be superfluous and unnecessary.[13] We also cannot conclude that the instances of potential misconduct that appear in the record were necessarily so minor or irrelevant that they must be found by the district court to have played no role whatsoever in the jury's verdict. In this case, the jury found in favor of Pentair, but the evidence supporting that verdict was far from overwhelming or clear. Several of Pentair's witnesses conceded the essential points that Pentair knew of prior explosions occurring in split-shell filters and that safer alternatives to such filter designs were commercially feasible. Similarly,

---

[12]According to the deposition testimony of Terry Keskey, a plumbing company visited Michaels' home shortly after the explosion. But under Nevada law, merely consulting a plumber in the wake of a pool explosion does not equate to retaining an expert who must, or is even qualified to, testify at trial. *See Higgs v. State*, 126 Nev. 1, 16, 222 P.3d 648, 658 (2010) ("NRS 50.275 is the blueprint for the admissibility of expert witness testimony" and a witness is not permitted to be qualified as an expert unless certain specific legal requirements have been satisfied).

[13]We emphasize that, by including these observations, we do not conclude that the arguments cited here necessarily represented reversible misconduct; the district court must make the necessary findings on remand before they can be considered by us on appeal. Conversely, we also do not intend to suggest that any instances of alleged misconduct cited by Michaels but omitted from our discussion could not have constituted misconduct. Rather, we include these particular instances merely as illustrations in response to Pentair's contention that a remand is unnecessary because the district court could not possibly have concluded that reversible misconduct occurred at any point in the trial.

Pentair did not present any substantive evidence that Michaels unforeseeably misused or modified the FNS filter in any way.[14] Rather, in the absence of substantive evidence, Pentair invited the jury to infer that such unforeseeable modifications might have happened because some pieces of the filter system were missing and because the testimony of Michaels' witnesses was supposedly not credible. Thus, at least some of the apparent misconduct in this case related to the heart of Pentair's defense strategy and to the most important questions the jury was asked to answer. Under these circumstances, we cannot conclude that the alleged misconduct related only to matters of no consequence and could not possibly have resulted in fundamental injustice. Thus, in this case, the record indicates that misconduct could be deemed to have occurred, and that the evidence supporting the products liability verdict was weak. However, in the absence of detailed findings, we cannot determine whether no other reasonable explanation exists for the verdict but the alleged misconduct.

In this case, had the district court engaged in a comprehensive analysis, it could have concluded that misconduct occurred and that the misconduct was both severe and repeated. *See Gunderson*, 130 Nev. at

---

[14]A number of Pentair's employees and engineers conceded that accidental dead-heads during cleaning were foreseeable. Thus, even if it were true that Michaels had caused such a dead-head to occur while cleaning the filter canister, as Pentair's counsel suggested during his closing argument, such a conclusion may have been legally irrelevant to the question of whether the FNS filter was improperly designed. Comparative negligence is not a defense to strict liability, and therefore even if Michaels had improperly dead-headed the system while cleaning it, Pentair may still be liable for manufacturing a dangerous product so long as dead-heading was a foreseeable event.

___, 319 P.3d at 612. Furthermore, when viewed in context, the district court could have concluded that the misconduct played a critical role in the case. *See id.* at ___, 319 P.3d at 614 (instances of misconduct must be evaluated "as determined by their context"); *see also Grosjean v. Imperial Palace, Inc.*, 125 Nev. 349, 364, 212 P.3d 1068, 1079 (2009).

Accordingly, the record in this case is not so clear that detailed findings by the district court are clearly unnecessary. Furthermore, the district court's failure to engage in the exercise of making specific and detailed findings particularly matters when the district court acted without considering the Nevada Supreme Court's reasoning in *BMW* and without the benefit of *Gunderson*.[15] Had such detailed findings been made, we could more easily determine whether those new cases would have affected the district court's analysis. Therefore, we must remand this matter to the district court for additional findings and further direct the district court to reconsider its conclusion in view of these cases and the standard set forth in this opinion.[16]

On remand, the district court must clarify, at a minimum, whether it found that no misconduct occurred or rather whether it concluded that misconduct did occur but was harmless under the

---

[15]The district court also did not have the benefit of the Nevada Supreme Court's recent decision in *Franchise Tax Board of California v. Hyatt*, 130 Nev. at ___, 335 P.3d at 152, *cert. granted in part*, 576 U.S. ___, 135 S. Ct. 2940 (2015), which clarified the law relating to adverse inference instructions resulting from lost evidence.

[16]The only issue presented to us in this appeal concerned the products liability claim, and therefore this remand is limited only to that claim. Because Michaels did not present argument on the other claims for relief adjudicated below, we do not disturb those portions of the verdict, and the district court need not address those claims on remand.

standards of *Lioce* in view of: (1) the nature of the claims and defenses asserted by the parties; (2) the relative strength of the evidence presented by the parties; (3) the facts and evidence that were either disputed or not substantively disputed during the trial; (4) the type, severity, and scope of any attorney misconduct; (5) whether any misconduct was isolated and incidental on the one hand or repeated and persistent on the other; (6) the context in which any misconduct occurred; (7) the relationship of any misconduct to the parties' evidence and arguments; and (8) any other relevant considerations.

In reviewing these factors, the district court's ultimate goal is to assess whether any misconduct "offsets the evidence adduced at trial" such that "no other reasonable explanation for the verdict" exists but that it was the product of the misconduct. *See Grosjean*, 125 Nev. at 363, 212 P.3d at 1079 (internal quotations omitted). In doing so, the district court must "assume that the jury believed all of the evidence favorable to" the party against whom the motion is made. *Id.* at 366, 212 P.3d at 1080. Nevertheless, when serious and repeated attorney misconduct has demonstrably occurred, the district court's deference to the jury is more limited than if such misconduct had not occurred, and the trial court must carefully consider whether the misconduct led the jury astray and caused it to base its verdict upon something other than the evidence and the applicable law.

COURT OF APPEALS
OF
NEVADA

(O) 1947B

27

## CONCLUSION

For the foregoing reasons, we vacate the district court's denial of Michaels' motion for new trial and remand this matter to the district court for further proceedings consistent with this opinion.

_____, J.
Tao

I concur:

_____, C.J.
Gibbons

COURT OF APPEALS
OF
NEVADA

(O) 1947B

SILVER, J., concurring:

I concur in the result only. In my view, the majority decision prematurely highlights portions of the alleged misconduct during closing argument and unnecessarily comments on the strength of the evidence presented at trial. Yet, the majority also acknowledges that the district court seemingly did not have the benefit of transcripts when it considered the new trial motion due to the timing involved in such post-trial motions, and that it did not have the benefit of authority and guidance from the supreme court's decision in *Gunderson v. D.R. Horton, Inc.*, 130 Nev. ___, 319 P.3d 606 (2014). The majority further notes that, in denying the new trial motion, the district court did not consider the supreme court's reasoning in *BMW v. Roth*, 127 Nev. 122, 252 P.3d 649 (2011). No further instruction or analysis is required for this court to resolve this appeal. Therefore, a limited remand in this matter directing the district court to make detailed findings regarding specific instances of alleged misconduct would have sufficed. Respectfully, I concur with only the result reached by the majority.

_____, J.
Silver